# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 27, 2013

## STATE OF TENNESSEE v. MICHAEL DEWEY ELLINGTON

**Direct Appeal from the Criminal Court for Monroe County**
No. 09-270    Amy A. Reedy, Judge

**No. E2012-00908-CCA-R3-CD - Filed August 13, 2013**

The appellant, Michael Dewey Ellington, was convicted of the first degree premeditated murder of his girlfriend, Julia Kinsey, and was sentenced to life imprisonment in the Tennessee Department of Correction. On appeal, the appellant contends that the evidence is not sufficient to support a conviction of first degree premeditated murder, that the trial court erred in excluding photographs depicting the contents of the victim's purse, and that the trial court erred by admitting a photograph depicting the victim's wounds. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

C. Richard Hughes, Jr., and Jeanne L. Wiggins, Madisonville, Tennessee, for the appellant, Michael Dewey Ellington.

Robert E. Cooper, Jr., Attorney General and Reporter, Leslie E. Price, Senior Counsel; R. Steven Bebb, District Attorney General, and James H. Stutts, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

On August 6, 2009, the Monroe County Grand Jury returned an indictment charging the appellant with the first degree premeditated murder of Julia Kinsey in violation of Tennessee Code Annotated section 39-13-202.

At trial, Deputy Clinton Blake Brookshire of the Monroe County Sheriff's Department testified that at 11:06 p.m. on March 17, 2009, he was dispatched to 1637 Old Highway 68.

When he arrived at the residence at 11:10 p.m., he saw the appellant's two brothers at the back of the residence. The brothers told Deputy Brookshire that they entered the residence at 10:48 p.m., found the victim, and called the police.

Deputy Brookshire said that he entered the residence and discovered the victim lying face-down on the bedroom floor between a nightstand and the left side of the bed. He saw an unloaded, "single shot break action shotgun on the bed, with the action open." A spent shotgun casing was lying on the floor. Deputy Brookshire backed out of the bedroom and called for detectives and other necessary personnel. Emergency medical technicians (EMTs) Carlene Woods and Dennis Hughes arrived at the scene, and Deputy Brookshire led Hughes into the bedroom. Hughes rolled the victim onto her left side and felt her neck for a pulse. Finding no pulse, Hughes returned the victim to her original position and exited the room the way he had entered so as not to disturb the scene. Deputy Brookshire left the scene at 3:00 a.m.

On cross-examination, Deputy Brookshire testified that he did not know who placed the 911 call. He secured the scene and later turned the investigation over to Captain Michael Morgan. Deputy Brookshire did not see wadding, lead, or a knife in the bedroom; however, he saw one spent shotgun shell and one unspent round on the floor. Deputy Brookshire did not remember whether the bedroom door was open or closed when he arrived.

Dennis Reed Hughes, a Monroe County paramedic, testified that on the night of March 17, 2009, he responded to the scene on Old Highway 68. When he arrived, he went inside the residence to confirm the death of the victim. Inside the bedroom, he saw the victim lying face-down on the floor. Hughes checked the carotid artery in the victim's neck and did not find a pulse. He determined that the victim was dead.

On cross-examination, Hughes said that Deputy Brookshire followed him into the bedroom and stood at the foot of the bed while Hughes examined the victim. Hughes said that Deputy Brookshire "watched to make sure I did nothing more than check for a pulse and breathing movements and that was it."

Monroe County Sheriff's Detective Travis Brian Jones testified that on the evening of March 17, he went to the crime scene and stayed approximately three minutes. While he was there, Captain Morgan instructed him to interview the appellant. Detective Jones went inside the residence, quickly surveyed the scene, and went outside. The appellant was placed in a patrol car and was transported to the sheriff's department by Sergeant Darian Goodman.

Detective Jones said that he followed Sergeant Goodman and, upon arriving at the sheriff's department, took custody of the appellant. Detective Jones took the appellant to an office and read the appellant his rights. After the appellant waived his rights, Detective Jones

interviewed him. Captain Morgan and Sheriff Bill Bivens were also present for the interview. Detective Jones authenticated a video of the appellant's interview, and the video was shown to the jury.

During the interview, the appellant said that he had known the victim for seventeen years, that he loved her, and that they usually stayed together at a house he and his older brother, Steve, owned. On the evening of March 17, the appellant and the victim went to a Mexican restaurant in Lenoir City. They visited with friends and drank "a couple beers." When they left the restaurant, the appellant and the victim argued about their relationship. The appellant said that they had been arguing for nine months. That night, the victim told him, "If we ever break up, nobody – nobody is going to have you." Upon arriving home, the appellant took the victim's purse inside the residence and put it on a chair. The victim walked into the kitchen, and the appellant thought she was getting something to drink. The appellant went to the bedroom, lay on the bed, and waited for the victim. He explained that they usually undressed together and watched television before going to sleep. A lamp in the corner of the room was turned on. The appellant said that the victim came into the bedroom and approached him with "something shiny" and that he knew "it was a knife." He could not describe the knife or how the victim was holding the knife. The victim did not say anything. The appellant got off the bed, pushed the victim, and she fell. When she started to get up, the appellant grabbed a 12 gauge shotgun he kept behind the bedroom door. The victim "rolled over" and started to get up, with the knife still in her hand. The appellant pushed the victim down a second time. When she started to get up, the appellant shot her. The victim fell back and rolled over, face down. He said that his stepfather had given him the gun because he had "been having problems with some people [who were] threatening our lives."

The appellant said that the victim had a temper and that he feared she would cut him. The appellant said that he and the victim had fought in the past; however, that night, the victim seemed "crazy" and had "snapped." After the shooting, the appellant opened the gun and threw it on the bed. He left without touching the victim or the knife and drove to his mother's house where he spoke with his brothers. Detective Jones told the appellant that he had talked to one of the appellant's brothers, who said that the appellant told him that the appellant killed the victim because "she was trying to set [the appellant] up." The appellant responded, "I don't know nothing about that." The appellant said that he did not plant the knife on the victim. The appellant said that he did not know how many shells the gun would hold, stating, "I ain't even shot it during my life. . . . I just pulled the trigger." The appellant said that the victim took Xanax for depression and that he took medication for his thyroid, high blood pressure, and cholesterol. The appellant denied using illegal drugs.

During the interview, Captain Morgan asked the appellant if he loaded the gun or if the gun was already loaded when he grabbed it, noting that the police had found extra shells at the scene. After a lengthy pause, the appellant said that the box of shells was behind the

television. The appellant said, "The gun had a shell in it, and when I thr[ew] the gun, I took the shell out of it, put the shell box down on the bed with the gun." He said that when he opened the gun, the shell bent and fell out of the gun. He left the empty shell on the floor and walked out of the room. The appellant denied that he loaded the gun just prior to the shooting. The appellant maintained that after he shot the victim, he grabbed the box of shells because he feared the victim would get up and come after him again. He said that he dropped the gun on the bed because he knew what he had done. The appellant denied that he intended to reload the gun and asserted that he grabbed the box of shells, intending to put the used shell casing in the box.

After the interview ended, Detective Jones transported the appellant to Sweetwater Hospital and watched as a blood sample was taken from the appellant. The blood sample was sent to the Tennessee Bureau of Investigation (TBI) for analysis.

On cross-examination, Detective Jones testified that when he arrived at the crime scene, the appellant was standing outside. While Detective Jones was at the crime scene, he saw a knife and noticed that there was blood all over the knife. The crime scene was sealed for almost four hours and then was released to the family. Detective Jones testified that the police did not obtain fingerprints from the shotgun shells or the knife and that no DNA analysis was performed on those items. Regardless, the appellant admitting touching the shotgun shells and the box. Detective Jones said that the appellant was generally cooperative during the interview.

Dr. Stephen Cogswell, the Deputy Chief Medical Examiner for Knox and Anderson Counties, testified that on March 18, 2009, he performed an autopsy on the victim. The victim was sixty-two inches tall and weighed 199 pounds. Dr. Cogswell determined that the victim's death was caused by a single projectile slug that entered just behind and below the victim's right ear. The slug severed the victim's spine at the top two cervical vertebrae and exited the corner of the jaw at the front, left side of the chin. Dr. Cogswell found bruises of various ages on the victim's shoulders, back, left upper arm, and right hand. Dr. Cogswell estimated that the victim had been shot from a distance of between two and ten feet.

Dr. Cogswell testified that he took blood, urine, and vitreous samples from the victim and sent them to the lab for analysis. The results revealed that the victim had .13 micrograms per milliliter of methamphetamine in her system. The amount was "at the upper end of the therapeutic range" and could have been toxic to someone sensitive to methamphetamine. The results also revealed Fluoxetine or Prozac in her system in "a high therapeutic to low toxic range dose." The toxicology screen also revealed the presence of dihydrocodeinone, which was commonly found in cough syrup. Additionally, the victim's blood alcohol content was .10.

Monroe County Sheriff's Detective Douglas W. Brannon testified that on March 17, 2009, he responded to Old Highway 68 and that he processed and handled the crime scene. When he went into the bedroom, he saw the victim lying on the floor, surrounded by blood. She was lying next to the bed, and the wall was to her left. Detective Brannon testified that a knife was found near the victim but that the knife was difficult to see. Detective Brannon saw four indentations on the bedpost nearest the victim's head. Something appeared to be embedded in the wood. Detective Brannon also found blood spatter on the quilt covering the bed.

Detective Brannon said that he also found a spent shotgun shell and an unfired shotgun shell on the bedroom floor. Additionally, on a table he found several shotgun shells that were not the same type as the shell found on the floor. On the bed, Detective Brannon found a single barrel hammer shotgun that had been "broke[n] open." He explained that loading the weapon required four separate actions: (1) placing a projectile in the barrel, (2) shutting the barrel, (3) cocking the hammer, and (4) pulling the trigger. Some clothing and a box for five, 12 gauge, Winchester, "sabot" shotgun shells were also on the bed. Two or three unspent shells were in the box. The shells in the box were the same type as the unfired shell and the spent shotgun shell found on the floor.

Detective Brannon said that around the knob or lock area of the bedroom door, "there was a crack, or some disfiguration or offsetting of the lock itself." He surmised that "there had been a force applied to that door at some point."

Detective Brannon inventoried the contents of the victim's purse and discovered prescription bottles, which contained hydrocodone and alprazolam.

On cross-examination, Detective Brannon said that he saw black scuff marks on the bedroom floor. He said that the victim was wearing tennis shoes, that law enforcement officers generally wore boots, and that he did not know what kind of shoes the appellant was wearing. A butcher block containing knives with black handles and shiny metal blades was in the kitchen. The knives were the same type as the knife found in the bedroom.

Detective Brannon said that the appellant's booking sheet reflected that the appellant was six feet and one inch tall and weighed 211 pounds.

Detective Brannon said that the shotgun was not tested to determine if it was operable and that the knife was never tested. Some items, including the pill bottles and a cellular telephone from the victim's pocket, were collected by the police then returned to the victim's family. He did not recall opening the bottles, explaining that it was not relevant to the murder investigation.

Detective Brannon stated that he had received "[p]hysical contact training" and "[e]dged weapon training or reaction" as part of his law enforcement training. He had heard of a "21 foot rule," which suggested that "a person with an edged weapon within 21 feet is considered a dangerous threat." In other words, "if you are within a 21 foot zone and you are not prepared to defend yourself while you are in that zone then you could be the object of an attack, an actual physical danger [from the person with] the knife."

On redirect examination, Detective Brannon said that officers were taught about the "21 foot rule" for personal safety reasons and so that an officer could attempt to find nonlethal ways, such as retreating, to deal with a situation. However, he asserted that the rule did not "establish a zone in which you can justify killing another human being."

On recross-examination, Detective Brannon stated that he did not recall testifying at the preliminary hearing that the knife was found underneath the victim's body and that it was not visible until the body was moved.

Adam Gray, a forensic scientist with the TBI crime laboratory, testified that toxicological testing of the appellant's blood sample revealed the presence of less than .1 micrograms per milliliter of methamphetamine. No other drugs were found in the appellant's blood.

Margaret Massengale, a special agent forensic scientist with the TBI crime laboratory, testified that she tested the appellant's blood sample for alcohol and found none.

The State rested its case-in-chief, and the defense rested without submitting proof. The jury convicted the appellant of first degree premeditated murder, and he was sentenced to life imprisonment. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction of first degree premeditated murder, the exclusion of photographs depicting the contents of the victim's purse, and the admission of a photograph depicting the victim's wounds.

## II. Analysis

### A. Evidentiary Rulings

### 1. Photograph of Victim's Purse

The appellant claims that the trial court erred by excluding a photograph of the contents of the victim's purse, which included some prescription pill bottles and a green substance that appeared to be marijuana. He maintains that the photograph demonstrates the police investigation "was cursory and flawed as the content of the pill bottles were not

closely examined for content even when they were located in the purse with what appeared to be marijuana." The appellant further maintains that the drugs supported the appellant's claim that the victim "just went off" after ingesting toxic doses of drugs. In response, the State asserts that the photograph was not relevant to any issue at trial and was therefore inadmissible.

During Detective Brannon's cross-examination, defense counsel sought to introduce a photograph depicting the contents of the victim's purse, including two prescription pill bottles and a baggie containing a green substance that appeared to be marijuana. Only one of the prescription bottle labels can be seen, and it reveals that the victim had a prescription for "alprazolam." The State objected to the introduction of the photograph. During a jury-out hearing, defense counsel argued that the photograph was relevant to establish that the State had failed to thoroughly investigate the homicide and "treat[] it like a drug case." He contends that the green substance should have been tested to determine if it was marijuana and that the pills in the bottles should have been counted. Defense counsel contended that the drugs found in the victim's purse related to the drugs found in the victim's blood. The State responded that the appellant admitted shooting the victim and that there was no evidence that the drugs played any role in the killing. The trial court held that the photograph was not probative with respect to any material issue in dispute and that it was potentially unfairly prejudicial because there was no proof that the green substance was marijuana. Consequently, the trial court excluded the picture.

Generally, decisions concerning the admissibility of evidence at trial are entrusted to the discretion of the trial court. See State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). "A trial court's exercise of discretion will not be reversed on appeal unless the court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)); see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In determining the admissibility of photographs, trial courts must evaluate them in light of Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). In order to be admissible, any photographs must be relevant and their probative value must outweigh their potential to cause unfair prejudice. See Tenn. R. Evid. 403. Relevance is broadly defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In considering whether photographs are relevant, trial courts must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). When deciding whether photographs pose a risk of unfair prejudice, trial courts must consider whether the photographs have "[a]n undue tendency to suggest decision on an

improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951 (citation and internal quotations omitted).

At trial, the appellant alleged that he acted in self-defense after the victim "lost it," "just went off," and came at him with a knife. Dr. Cogswell testified that the victim had potentially toxic levels of methamphetamine and Prozac in her system, which was supported by the toxicology report. However, no evidence was presented regarding how the victim's behavior may have been altered by the amount of drugs in her system. More importantly, there was no evidence of marijuana or alprazolam in the victim's system.

Even if the photograph were relevant and probative, the potential for unfair prejudice by the jury viewing the photograph was high. The photograph depicted two prescription pill bottles and a plastic baggie containing a green substance that appeared to be marijuana. The substance was never tested; therefore, it was never confirmed that the substance was marijuana. Further, there was no proof that either the appellant or the victim had recently used marijuana. Accordingly, the inference that the victim may have possessed marijuana was not relevant to any fact of consequence to the appellant's case and could have prejudiced the jury against the victim as an illegal drug user. Moreover, there was already proof about the toxic levels of drugs in the victim's system. Therefore, we conclude that the trial court did not abuse its discretion.

## 2. Photograph of Victim's Body

The appellant also claims that the trial court erred by admitting a photograph of the exit wound in the center of the victim's chin that was caused by a metal slug. The appellant asserts that the photograph was graphic and was taken while the victim was in a body bag. He also complains that the photograph could have confused the jury because there were additional injuries to the victim's face, which were caused by the separation of the slug. The appellant contends that Dr. Cogswell's testimony sufficiently described the path of the projectile, thereby diminishing any potential probative value. In response, the State asserts that the photograph was not unduly gruesome and "supported the testimony of the medical examiner and the investigating officer regarding the location of the victim at the time of the shooting and the trajectory of the bullet." Therefore, the State contends that the photograph was admissible. We agree with the State.

Generally, crime scene photographs must be relevant to some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. See Banks, 564 S.W.2d at 951. Further, photographs are not necessarily rendered inadmissible because they are cumulative with other evidence or because descriptive words could have been used instead. See Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973). Initially, the State intended to admit two photographs of the wound, but the trial court

allowed only one to be admitted into evidence. The photograph that was admitted depicts the victim's bloody face and is not unduly gruesome. Therefore, the potential for undue prejudice is low. Additionally, the photograph has significant probative value. Dr. Cogswell testified that the slug entered behind the victim's right ear and exited through her chin; however, his testimony did not fully convey the exact path of the slug through the victim's body with the precise accuracy of the photograph. The trajectory of the bullet was a crucial piece of evidence at trial and supported the State's theory. During the police investigation and his ensuing trial, the appellant argued that the slug's back-to-front trajectory was the result of the victim's raising up to lunge toward him with the knife, which supported his theory of self-defense. Detective Brannon said that the evidence at the scene indicated that the victim was shot while lying on the floor. The photograph of the exit wound supported Dr. Cogswell's testimony about the trajectory of the bullet and Detective Brannon's testimony and afforded the jury a more complete picture of what transpired. See State v. Alexis Mason, No. W2010-02321-CCA-R3-CD, 2013 WL 1229447, at *12-13 (Tenn. Crim. App. at Jackson, Mar. 27, 2013). The trial court did not abuse its discretion in admitting this photograph.

## B. Sufficiency of the Evidence

Finally, we turn to the appellant's challenge to the sufficiency of the evidence sustaining his first degree murder conviction, specifically contending that the State failed to prove premeditation. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is

based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant was convicted of first degree premeditated murder, which is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation involves "an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). However, "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id.

"Premeditation may be proved by circumstantial evidence." State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008). "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d)). Premeditation "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The appellant does not dispute that he intentionally shot and killed the victim. However, he contends that the State failed to prove premeditation. He further asserts that the proof established that he was acting in self-defense.

Tennessee's self-defense statute provides in pertinent part that

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an

imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2). If a defendant raises facts sufficient to support a finding of self-defense, the "[S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). Self-defense is generally a fact question decided by the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "[I]n the context of judicial review of the jury verdict, in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743.

In the light most favorable to the State, the proof at trial revealed that the appellant and the victim had argued as they came home from a restaurant. The appellant asserted that he pushed the victim to the floor to prevent her from attacking him with a knife. However, a photograph of the scene reflects that the victim was found lying face-down on the floor, that her right arm was not visible but her left arm was under her body, that her hair was lying around her head on the floor, and that the knife was found on top of her hair, which was an unlikely placement if the victim had truly been charging the appellant with the knife. The appellant said the shotgun was loaded when he retrieved it. However, the box of shells on the bed and an unspent shell on the floor suggested that the appellant loaded the weapon immediately prior to shooting the victim. The appellant asserted that after he pushed the victim to the floor a second time, he shot her to prevent her from assaulting him. However, Dr. Cogswell testified, and the photograph of the victim revealed, that the victim was shot in the back of the head behind her ear, and the bullet severed her spine before exiting her chin. The bullet trajectory indicated that the victim was not facing the appellant at the time of the shot. Additionally, indentations on the bedpost beside the victim's head appeared to be the result of a shot being fired toward the floor. The medical examiner said that the shot was fired from at least two feet away. The appellant put the shotgun and the shells on the bed and left the scene without checking to see if the victim were still alive or calling 911. Once the appellant arrived at his mother's house, he told his brothers what he had done. His brothers went to the scene and stayed for approximately eighteen minutes before calling 911, providing them the opportunity to plant the knife that was later discovered by the police. Further, the video of the appellant's interview with the police reveals that the appellant

-11-

became uncomfortable and defensive when the police asked him to explain by the box of shells was on the bed and an unspent shell was on the floor.

The jury obviously discredited the appellant's assertion that he killed the victim in self-defense. It is the province of the jury to assess the evidence and the credibility of the witnesses, and we do not revisit the jury's determinations with respect to these issues on appeal. See, e.g., State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012). We conclude that the evidence was sufficient to sustain the appellant's conviction of first degree premeditated murder.

### III. Conclusion

In sum, we conclude that the trial court did not err in excluding the photograph of the contents of the victim's purse and admitting the photograph of the exit wounds. Further, we conclude that the evidence was sufficient to support the appellant's conviction. Accordingly, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE