# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 14, 2007 Session

## STATE OF TENNESSEE v. JUDGE BROOKS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 03-08238     Joseph B. Dailey, Judge**

---

**No. W2004-02834-SC-R11-CD - Filed March 20, 2008**

---

This case involves the applicability of the forfeiture by wrongdoing hearsay exception. We hold that the forfeiture by wrongdoing exception requires a showing that a defendant's actions were intended, at least in part, to prevent a witness from testifying. The prosecution in this case failed to prove that a motive for the murder was to make the victim unavailable as a witness. Admission of her hearsay statements, therefore, violated Tennessee Rule of Evidence 804(b)(6). We further conclude that the error affected the result of the trial. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand the case for a new trial.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Reversed; Case Remanded**

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and CORNELIA A. CLARK and WILLIAM C. KOCH, JJ., joined. GARY R. WADE, J., not participating.

Robert Wilson Jones, Shelby County Public Defender, and Tony N. Brayton, Garland Ergüden, Timothy J. Albers, and Donna Armistead, Assistant Shelby County Public Defenders, for the appellant, Judge Brooks.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

I. Factual and Procedural Background

The defendant, Judge Brooks, was convicted of first degree premeditated murder for beating his girlfriend, Deborah Chance, to death. The defendant did not dispute that he killed the victim.

On July 21, 2003, at 3:00 a.m., Officer Jeremy Wells of the Memphis Police Department was dispatched to an apartment at 1290 Texas Street. The defendant flagged down Officer Wells, said that he had telephoned the police, and urged Officer Wells to go inside to help his girlfriend, explaining, "We got to fighting earlier, and I think I might have killed her." Officer Wells described the defendant as hysterical but cooperative and anxious for officers to enter the apartment.

Once inside, officers found the victim's fully clothed body lying face down in the bathtub. Officers noticed broken glass all over the apartment, a large amount of blood on the living room floor, blood splatters on the living room walls, a bloody pillow near the bedroom doorway, a bloody pillow in the kitchen doorway, a broken lamp in the kitchen trash can, and a bloody t-shirt on the living room couch.

An autopsy performed by Shelby County Medical Examiner O.C. Smith, M.D., revealed that the victim had a blood-alcohol level of .244, well above the level of legal intoxication. Her clothes and head were wet, and a significant amount of water was found inside her stomach, suggesting that she may have been under water for some time. Dr. Smith discovered bruises of varying ages on her arms and legs, some more than forty-eight hours old. He found recent bruises on her forehead, neck, and right wrist and patterned scrapes beneath her left eyebrow and on the left side of her neck. Dr. Smith opined that the patterned scrapes were made with a serrated edge but conceded that these marks could also be consistent with the victim's fall onto broken glass. The victim had lacerations on the bridge of her nose and on both sides of her nostrils that could have been caused by a fist. Her cheeks and lips were bruised, externally and internally, and her lip was torn away from her gum. Blood had pooled in her eyelids, making her eyes appear black. The victim had a laceration and a small superficial "flick" wound behind her left ear that could have been caused by a knife or by her fall onto broken glass. The victim had bleeding on the surfaces of her brain, and blood had collected beneath her scalp. The injuries to the back of her head suggested that she had been struck multiple times with a specific object, and the pattern was consistent with the sole of a shoe. Dr. Smith opined that the victim died of brain swelling caused by blunt trauma injuries to her head consistent with an assault. On cross-examination, Dr. Smith acknowledged that the victim had cirrhosis of the liver, which increases bleeding and bruising, and that her blood alcohol level was high, which could have impaired her coordination and resulted in a fall. Nevertheless, Dr. Smith did not believe that the victim sustained the fatal head injuries in a fall, noting the "global" nature of her injuries.

Harlie Smith, the victim's uncle, testified. Mr. Smith, who lived in Springfield, Tennessee, recounted several out-of-court statements made to him by the victim in the months, days, and hours preceding her murder. In May 2003, the victim telephoned Mr. Smith and told him that she was coming to Springfield because the defendant had beaten her. When the victim arrived, her eyes were bruised, clumps of her hair were pulled out, and the side of her head was swollen. The victim told

Mr. Smith that the defendant caused her injuries. The victim eventually returned to Memphis because she did not want to lose her job.

Latisa Bridges, the defendant's niece, witnessed the May 2003 assault. Ms. Bridges testified that she and the victim were on their way to a nightclub at around 11:00 p.m. and stopped at the Texas Street apartment to give the defendant the keys to the apartment. When they arrived, the defendant was waiting outside in the rain. The victim got out of the car and gave the keys to the defendant, who turned and walked toward the apartment. The victim then hit the defendant on the back of his head, and he turned and slapped her. The victim fought back, spitting blood on the defendant, and he slapped her again. The defendant told the victim to leave, but she continued to fight him. The defendant hit the victim with his fist, knocked her to the ground, and kicked her. Ms. Bridges then got out of the car, grabbed the defendant, and said, "Don't do that." The defendant replied, "Well, get her and go. Tell her to leave me alone." Ms. Bridges put the victim in the car, and the defendant went inside the apartment. The police arrived before Ms. Bridges and the victim left the area. The victim refused to press charges, telling the police that she loved the defendant.

An investigator with the Shelby County District Attorney General's Domestic Violence Unit photographed the victim on May 15, 2003, and described her as nervous, scared, and on the verge of tears. A warrant charging the defendant with assault was issued on May 16, 2003. The warrant included the victim's affidavit of complaint that was made before a judicial commissioner. The affidavit of complaint was read into evidence by an employee of the Shelby County Criminal Court Clerk's Office. In the affidavit, the victim alleged that on May 10, 2003, the defendant hit her in the face with his fist and "stomped" her face and chest. The warrant was not executed until July 22, 2003, one day after the victim's murder.

On July 19, 2003, the victim telephoned Mr. Smith. The victim told him that she and the defendant were having a lot of problems and that she did not know how to get out of the relationship or what to do. Mr. Smith advised the victim to leave Memphis and drive to Springfield. She did not take Mr. Smith's advice, however. At approximately 6:00 p.m. on July 20, 2003, the victim again telephoned Mr. Smith. The victim told Mr. Smith that the defendant had been beating her all day, that she was afraid of him, and that she wanted to get away. Mr. Smith offered to drive to Memphis to pick up the victim. The victim refused Mr. Smith's offer. She indicated she was going to sneak away and come to Springfield. In the background, Mr. Smith heard a man, whom the victim said was the defendant, saying that the victim was not going anywhere, that she was his "bitch" and "whore," and that he was going to kill her. The victim asked Mr. Smith to call the police and send them to Texas Street. The victim said that she would try to have the defendant at that location when the police arrived because she "had a warrant on him." Unfamiliar with the Memphis area, Mr. Smith did not feel comfortable calling the police. Instead, he called the victim's ex-boyfriend, who lived in Memphis, and asked the ex-boyfriend to call the police.

The defendant did not testify. The defendant's defense was based on the premise that the defendant lacked the mens rea necessary for premeditated murder and that the victim's death was, at most, second degree murder arising out of a drunken brawl between the couple. The defendant relied on the couple's history of mutual physical conflict, the victim's history of alcoholism, and the defendant's summoning of the police and cooperation when they arrived. The defendant attempted

to show that the victim was not afraid of him. The defendant presented the testimony of the owner of a Memphis lounge, who said that the defendant and the victim came into the lounge on the afternoon of July 20, 2003. The couple left together, returned later, and then left again between 7:00 p.m. and 9:00 p.m. They drank beer, but they were not drunk and were not arguing or fighting.

The defendant also called as a witness an employee of the General Sessions Clerk's Office, who said that, on May 15, 2003, the victim signed a petition seeking an order of protection against the defendant. At the request of defense counsel, this employee read the victim's affidavit of complaint into evidence. This was the same affidavit of complaint introduced into evidence earlier by the prosecution. The petition seeking an order of protection had been dismissed because the victim failed to appear.

Betty Zabt, the victim's aunt, testified in rebuttal for the prosecution. Ms. Zabt met and talked with the defendant in the fall and winter before the victim's death. When the victim visited Ms. Zabt in Springfield in May 2003, clumps of the victim's hair were missing, her eyes were black, and she had multiple bruises. Ms. Zabt overheard the victim talking to the defendant on the telephone. The victim held the telephone out, and Ms. Zabt heard the defendant yell, "You bitch, I will kill you."

The defendant objected to admission of the victim's statements made to Mr. Smith about the May 2003 assault, her statements in the May 2003 affidavit of complaint, and her statements to Mr. Smith in the days and hours preceding her murder. The trial court declined to exclude this evidence, finding it admissible pursuant to the forfeiture by wrongdoing hearsay exception. In reaching this conclusion, the trial court stated its view that the forfeiture by wrongdoing exception does not require evidence that the defendant intended to prevent the witness from testifying. The jury convicted the defendant of first degree premeditated murder. The trial court imposed the mandatory sentence of life imprisonment.

The Court of Criminal Appeals affirmed in a split decision. All members of the panel agreed that the trial court erred in admitting the victim's hearsay statements because the prosecution failed to prove that the defendant killed the victim for the purpose of making her unavailable as a witness. The majority held, however, that this error did not violate the defendant's right to confrontation because the constitutional doctrine of forfeiture by wrongdoing does not require proof of motive. Concurring and dissenting, Judge Tipton asserted that the constitutional doctrine, like the hearsay exception in 804(b)(6), requires a showing that the defendant's actions were undertaken for the purpose of preventing the victim from testifying. We granted the defendant's application for permission to appeal.

## II. Analysis

Questions concerning the admissibility of evidence generally "rest within the sound discretion of the trial court[,] and this Court will not interfere with the exercise of this discretion in the absence of a clear showing of abuse appearing on the face of the record." State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007). "An abuse of discretion occurs when the trial court applies an incorrect legal standard . . . ." Id.

The forfeiture by wrongdoing hearsay exception provides:

(b) The following are not excluded by the hearsay rule if the declarant is unavailable[1] as a witness:

. . . .

(6) Forfeiture by Wrongdoing. – A statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness.

Tenn. Rule Evid. 804(b)(6). In <u>State v. Ivy</u>, 188 S.W.3d 132 (Tenn. 2006), we recently held that the following principles apply to the application of the forfeiture by wrongdoing exception: 1) the rule does not limit the subject matter of the statements; 2) the rule is not limited to statements made when a formal charge or judicial proceeding is pending against the defendant; 3) the trial court must conduct a jury-out hearing to determine whether statements are admissible; 4) the trial court must find that a preponderance of the evidence establishes "that the defendant was involved in or responsible for procuring the unavailability of the declarant"; and 5) the trial court must find that a preponderance of the evidence establishes "that a defendant's actions were intended, at least in part, to procure the absence of the declarant." 188 S.W.3d at 147.

Contrary to our holding in <u>Ivy</u>, the trial court in this case stated that the forfeiture by wrongdoing exception is applicable even if the defendant did not intend, at least in part, to procure the absence of the victim. We therefore conclude that the trial court erred by applying an incorrect legal standard.

Having concluded that the trial court applied the incorrect legal standard, we must now decide whether the victim's statements would have been admissible under the proper standard. In making this determination, it is helpful to review our application of the forfeiture by wrongdoing exception in <u>Ivy</u>. That case involved a defendant, Ivy, who assaulted his girlfriend, followed her when she went to the police department to swear out a warrant against him, threatened to kill her if she "put the police in [his] business," and killed her two days after making the threat. <u>Ivy</u>, 188 S.W.3d at 139-40. We held that this evidence adequately supported the trial court's finding that Ivy had killed his girlfriend to prevent her from contacting the police about his earlier aggravated assault against her. <u>Id.</u> at 147. We emphasized, however, that Rule 804(b)(6) did not require Ivy to know the arrest warrant for the aggravated assault had been issued. <u>Id.</u> We also emphasized that the rule did not require that Ivy's sole intent be to prevent his girlfriend from testifying against him in a proceeding based on the aggravated assault. <u>Id.</u>

In contrast to <u>Ivy</u>, there was no evidence that the defendant in this case threatened to harm the victim if she went to the police. There was no proof that the defendant followed the victim when

---

[1] "'Unavailability of a witness' includes situations in which the declarant . . . [i]s unable to be present or to testify at the hearing because of the declarant's death . . . ." Tenn. R. Evid. 804(a)(4).

she went to initiate charges against him. In fact, there is no evidence that the defendant became aware that the victim had spoken with the police. Immediately following the assault, the victim told the police that she did not want to press charges, and she continued to live with the defendant for two months after the incident. During a telephone conversation with Mr. Smith several hours before her murder, the victim indicated that she "had a warrant" on the defendant. It is unclear, however, whether the defendant overheard this comment. We conclude, therefore, that there is no evidence the defendant's actions in wrongfully killing the victim were intended, in whole or in part, to make her unavailable as a witness. Accordingly, the victim's statements should not have been admitted under Rule 804(b)(6).

Having concluded that the trial court's error resulted in the jury considering improperly admitted evidence, we must now determine whether that error "affirmatively appear[s] to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a). When determining whether an error affected the jury's verdict, we "evaluate that error in light of all of the other proof introduced at trial." State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000). "The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits." Id.

The defendant argues that the jury would not have found that the murder was premeditated had the trial court properly excluded the victim's statements. In light of the standards stated above, we must review all of the evidence and evaluate how strongly it supports a finding of premeditation. A premeditated act is one that is "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (Supp. 2007). Premeditation may be proved by circumstantial evidence. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Tennessee courts have recognized several factors that tend to demonstrate premeditation, including but not limited to use of a deadly weapon to kill an unarmed victim, the procurement of weapons used to commit a murder, declarations of intent to kill the victim, preparations for the concealment of a crime, lack of provocation by the victim, failure to provide aid or assistance to the victim, and calmness after the killing. See, e.g., id.; State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Evidence that a defendant delivered repeated blows to a victim may also support an inference of premeditation if it is coupled with other evidence that the blows were inflicted as a result of premeditation. Brown, 836 S.W.2d at 542. "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder" because "[r]epeated blows can be delivered in the heat of passion, with no design or reflection." Id.

We now turn to our evaluation of the evidence in this case. The greatest risk of harm stemmed from the testimony of Mr. Smith concerning statements the victim made to him in the hours preceding her death. Included in his testimony were the victim's statements that the defendant had been beating her all day, that she was afraid of him, and that she wanted to get away. Most significantly, the victim also identified the defendant as the person Mr. Smith heard threatening to kill the victim. Mr. Smith's testimony was therefore highly probative of premeditation and very damaging to the defense. Had the jury not heard the victim's statements to Mr. Smith, it would have been left with only two pieces of evidence supporting a finding of premeditation: 1) the extensive nature of the victim's injuries and 2) Ms. Zabt's testimony that she heard the defendant threaten to kill the victim approximately two months before the murder. The first piece of evidence

demonstrates that the defendant used repeated blows to kill the victim. The second piece of evidence is a declaration of an intent to kill the victim.

We conclude that the properly admitted evidence, although legally sufficient to support a conviction, is not sufficiently compelling to convince us that the error is harmless. As stated above, the defendant's use of repeated blows to kill the victim is not sufficient, in and of itself, to demonstrate premeditation. Id. The only other evidence that corroborates a finding of premeditation is Ms. Zabt's testimony that the defendant declared his intent to kill the victim. This evidence is mitigated, however, by the fact that approximately two months passed between the threat and the murder of the victim. The case for premeditation is further weakened by the fact that the defendant contacted the police and was reportedly hysterical and anxious when the police arrived. As noted above, whether a defendant provides aid to the victim and is calm after the killing are relevant to the determination of premeditation. See, e.g., Bland, 958 S.W.2d at 660; Brown, 836 S.W.2d at 541-42; Lewis, 36 S.W.3d at 96. Finally, there was no evidence that the defendant procured a weapon in advance of the killing, prepared to conceal the crime, or attacked the victim without provocation. In our view, this evidence is barely sufficient to support a finding of premeditation beyond a reasonable doubt, and the likelihood that the improperly admitted evidence affected the result of the trial is relatively high. See Gilliland, 22 S.W.3d at 274. Our conclusion is supported by the fact that the improperly admitted evidence in this case is particularly damaging to the defense. The defendant's brutal beating of the victim was despicable and clearly warranted a conviction for second degree murder. We conclude, however, that the finding of premeditation was affected by the admission of the victim's statements to Mr. Smith. Accordingly, the conviction is reversed and the case remanded for a new trial.[2]

### III. Conclusion

The forfeiture by wrongdoing hearsay exception under Tennessee Rule of Evidence 804(b)(6) requires a showing that a defendant's actions were intended, at least in part, to prevent a witness from testifying. The prosecution in this case failed to prove that a motive for the murder was to make the victim unavailable as a witness. Admission of the victim's hearsay statements therefore violated Rule 804(b)(6). We conclude that the error affected the result of the trial on the merits. We therefore reverse the judgment of the Court of Criminal Appeals and remand the case for a new trial. Costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

---

[2] We need not address the arguments regarding the application of the Confrontation Clause to testimony admitted under the forfeiture by wrongdoing hearsay exception because on remand the victim's statements will not be admitted under the forfeiture by wrongdoing hearsay exception.