IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs June 18, 2013

## STATE OF TENNESSEE v. EDGAR RAY BETTIS

**Direct Appeal from the Circuit Court for Dickson County**
**No. 22CC-2011-CR-280    Robert E. Burch, Judge**

**No. M2012-02158-CCA-R3-CD - Filed September 27, 2013**

The appellant, Edgar Ray Bettis, was convicted in the Dickson County Circuit Court of first degree premeditated murder; second degree murder; and unauthorized use of an automobile, also known as joyriding. The trial court merged the second degree murder conviction into the first degree murder conviction and sentenced the appellant to life. For the joyriding conviction, the trial court sentenced the appellant to eleven months, twenty-nine days to be served concurrently with the murder conviction. On appeal, the appellant contends that the evidence is insufficient to show that he murdered the victim, that the trial court erred by allowing the forensic pathologist to testify outside the contents of the autopsy report, and that the trial court's error resulted in the jury's improperly seeing a photograph of the victim's larynx. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

William B. Lockert, III (at trial and on appeal), and Rick Taylor (at trial), Ashland City, Tennessee, for the appellant, Edgar Ray Bettis.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Dan Mitchum Alsobrooks, District Attorney General; and Wendall Ray Crouch, Jr., and Billy Miller, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

In June 2011, the Dickson County Grand Jury indicted the appellant for first degree felony murder committed in the perpetration of theft, first degree premeditated murder, and theft of property valued $1,000 or more but less than $10,000. The victim of the murders was Frankie L. Hudson.

At trial, Howell N. Perkins, the victim's son, testified that the victim was seventy-nine years old at the time of her death and was "a hard working lady who grew up hard." The victim managed a trailer park next to her home and accepted rent from residents and made bank deposits. The victim had high blood pressure and took medication for it but was never dizzy. Perkins said that he had seen the victim give someone a "[t]ongue-lashing" but that he had never known her to be aggressive. A pistol, shotguns, and rifles were in the victim's home. The guns had belonged to Perkins' stepfather, and the victim was afraid of the pistol.

Agent Joe Craig of the Tennessee Bureau of Investigation (TBI) testified that on the afternoon of April 2, 2011, he was asked to assist local police officers from Burns and Dickson County with the victim's case and went to the victim's home. The victim was lying face-down on the living room floor. Blood was on her head and upper body, and a blue ashtray was on a coffee table about eight feet from the victim. Agent Craig thought the victim had received blunt force trauma. He began looking for anything that could have been used as a weapon and noticed a speck of red, yellow, or pink metallic paint on the blue ashtray. A similar flake of paint was in the victim's hair, and a piece of a number two pencil was on the floor between the victim's arm and head. The pencil was a reddish/pink color, and Agent Craig immediately determined that the paint on the pencil was consistent with the speck of paint on the ashtray. Agent Craig did not see anything on the floor around the victim's body to indicate that a struggle had occurred.

Agent Craig testified that he spoke with the appellant's brothers, who lived in the area, and learned that they had not seen the appellant in recent hours. Agent Craig also learned that the victim's car was missing. A "BOLO," be-on-the-lookout, was issued for the car, and Agent Craig received information from a cab driver who had picked up the appellant at a Pilot truck stop. The victim's car was at the truck stop. Based on the cab driver's information, Agent Craig sent an officer from the Dickson County Sheriff's Department to the Greyhound bus station in Nashville to determine if the appellant had bought a ticket there. Agent Craig was informed that the bus station possessed video showing the appellant purchasing a ticket to Shreveport, Louisiana, earlier that morning. The bus to Shreveport had left Nashville at 8:00 a.m.

Agent Craig testified that the victim's purse was in her home and was taken into evidence. A receipt book was on a table, and the victim had written a receipt dated April 1 for $260. However, she had not written a name on the receipt. A green money bag was on

a chair at the table, but no money was in the bag. Agent Craig learned that the appellant was living with his brothers in a single-wide trailer that was fifteen to twenty yards from the victim's back door, and Agent Craig searched the trailer. In the appellant's bedroom, officers found a gray striped shirt and a pair of dark Dickies pants. Hair consistent with the victim's hair was on the pants, and Walmart receipts for luggage, a six-pack of Ensure, and a bank withdrawal were in a pocket of the pants. According to the receipts, the appellant bought the luggage and Ensure at 11:43 a.m. and withdrew $298 at 12:27 p.m. on April 1. The officers found a pair of latex gloves in the bathroom. Agent Craig identified a receipt from the Comfort Inn in Dickson, showing that the appellant checked in at 8:56 p.m. on April 1 and checked out at 4:43 a.m. on April 2. Agent Craig said he viewed video from the Comfort Inn. In the video, the appellant appeared to be wearing the same gray striped shirt found in his bedroom.

Agent Craig testified that Jackson, Mississippi police officers arrested the appellant in Jackson about 7:30 p.m. on April 2. The next day, Agent Craig interviewed the appellant and wrote out his statement. The appellant signed the statement in which he said the following: On April 1, the appellant went to the victim's house in order to pay his share of the trailer rent, $250. The victim became upset and "began talking about Danny," a man who had rented the appellant's trailer prior to the appellant and his brothers. The victim said Danny owed her $10,000, became very angry, and yelled at the appellant. The appellant told her to calm down, but she kept yelling and shoved him. The appellant grabbed the victim by her hair to stop her, but she "kept coming at" him. The appellant grabbed an ashtray off a table and hit the victim on her head two or three times. He pulled out a stun gun and hit her neck two or three times, but it did not stop her. The victim tried to stab the appellant with a pencil, but the appellant grabbed the victim's hand and broke the pencil. The appellant grabbed the victim's neck and choked her until she stopped fighting. Their altercation lasted about twenty minutes. After the appellant choked the victim, he took her car keys, went to his trailer, took a shower, and changed clothes. He was wearing a gray shirt, Dickies slacks, and loafers. He packed his clothes, put the stun gun in one of his bags, and drove the victim's car to the Comfort Inn. The appellant rented a room and stayed there all night. The next morning, he left the victim's car at a Pilot truck stop, called a cab, and had the cab driver take him to the Greyhound bus station in Nashville. The appellant, who had four bags, bought a ticket to Shreveport. When the bus stopped in Jackson, Mississippi, the police arrested him.

Agent Craig testified that the blue ashtray and the outside of the green money bag were tested for fingerprints but that no prints were found. Other evidence collected in this case was sent to the TBI for analysis. Although no blood was visible on the appellant's gray striped shirt, testing revealed that the victim's blood was on one of the sleeves. No blood was on the latex gloves. Fingernail clippings from the victim showed that the appellant's

DNA was underneath her fingernails on her right hand.

Agent Craig testified that he did not see any injuries on the appellant during the appellant's interview, and he confirmed someone named Danny had lived in the appellant's trailer prior to the appellant and his brothers. Agent Craig said he did not think the appellant went home and took a shower immediately after killing the victim because the appellant was wearing the gray striped shirt and dark slacks when the appellant checked into the Comfort Inn. The Jackson Police Department gave Agent Craig three bags, but the stun gun was not in them, and Greyhound was unable to locate any additional bags belonging to the appellant. On the Greyhound luggage tags, the appellant had written the name "Ray Pew." Ray Pew was one of the appellant's brothers.

The State played videos from the Dickson Walmart and the Nashville Greyhound bus station for the jury. The Walmart video showed that on April 1, 2011, the appellant and his brother, Ron Pew, arrived in the Walmart parking lot in Pew's truck at 11:21 a.m. and went inside the store. The appellant was wearing a shirt and pants consistent with those found in his bedroom. At 11:42 a.m., the appellant bought four pieces of luggage and Ensure. He and Pew left Walmart at 11:46 a.m. About forty-five minutes later, the appellant made the withdrawal from Walmart Financial Services. Agent Craig said he did not know the appellant's whereabouts during that forty-five minutes or how the appellant got back to Walmart in order to make the withdrawal. Video from the bus station showed that when the appellant's cab arrived at the station on April 2, the appellant and the cab driver removed six bags from the trunk. Agent Craig said that based upon the evidence, he thought the appellant killed the victim between 7:00 and 9:00 p.m. on April 1.

On cross-examination, Agent Craig acknowledged that the appellant could have killed the victim, returned to his trailer, left his shirt there, and not returned. He also acknowledged that the shirt the appellant was seen wearing in the Comfort Inn video could have been similar to the one found in the appellant's trailer. One of the appellant's brothers, Edward Maples, gave a statement to police in which he indicated that the appellant returned home from the Comfort Inn and changed clothes. However, Maples also claimed that the appellant said he was going to have the mafia kill Maples if Maples testified against him. The appellant bought his stun gun in 2007, and Agent Craig acknowledged that there was no evidence the appellant planned to kill the victim. Although the appellant's buying luggage indicated that he planned to leave Dickson, the appellant and his brothers had discussed leaving prior to April 1. The appellant's source of monthly income was his $700 social security disability payment. Agent Craig did not find any evidence that the appellant and the victim had had issues in the past.

Agent Craig testified that the appellant claimed he and the victim went "back and

-4-

forth" during their twenty-minute struggle on April 1 and that he had to rest after struggling with her because he was tired. Agent Craig acknowledged that the appellant claimed he was trying to "choke her down" and that he may not have killed her intentionally. However, due to the appellant's strangling the victim, Agent Craig thought the appellant intended to kill her. He explained, "[Strangulation is] not something that is quick. And because of that, I feel like there was a long period of time that some thought was put into that." Agent Craig thought the victim was holding the pencil in her hand during the altercation and that she used it in self-defense. The appellant told Agent Craig that he thought the victim had a .38 caliber pistol. Agent Craig had heard from witnesses that the victim could be "feisty," but no one had reported her having aggressive behavior.

On redirect examination, Agent Craig testified that the victim did not write a name on the rent receipt prior to her death. Therefore, Agent Craig did not know if the victim was writing the receipt for the appellant. Moreover, the appellant claimed that his rent was $250, but the receipt was for $260. According to Edward Maples, the appellant returned home at 5:00 or 5:30 a.m. on April 2. The appellant was wearing latex gloves with blood on them and had a white garbage bag. The appellant put the gloves into one of his luggage bags and took the luggage with him. Agent Craig acknowledged that photographs of the crime scene showed two trash cans and that neither can had a trash bag in it. He said the gloves and the garbage bag indicated that the appellant altered the crime scene before the victim's body was discovered.

On recross examination, Agent Craig acknowledged that the appellant could have added ten dollars to his $250 rent payment for the water bill, making his total payment to the victim $260. Agent Craig also acknowledged that nothing indicated the appellant took the stun gun to the victim's home for the purpose of killing her. The appellant weighed about 240 pounds, and the victim weighed about 110 pounds.

Michael Adams, the owner of Mike's Taxi Cab and a judicial magistrate in Dickson County, testified that about 5:45 a.m. on April 2, 2011, he received a call from a man needing a taxi. The man said he wanted Adams to drive him to the bus station in Nashville, that he was at the Pilot truck stop, and that he would be the only man there with four or five black bags. Adams arrived at the truck stop about 6:00 a.m. The appellant was wearing blue jeans, a shirt, a jacket, boots, and a Tennessee Highway Patrol cap. Adams opened the trunk of his cab and offered to get the appellant's bags. He said the appellant told him, "[Y]ou get three of those and let me get these two, I don't want you touching these two." Adams put the three bags into the truck, and the appellant put in the other two bags. During the drive to Nashville, Adams asked the appellant where he was going, and the appellant said he was a retired state trooper and was going to Washington, D.C. to train officers. At some point during the drive, traffic backed up. The appellant became nervous and told Adams he was

in a hurry. However, the appellant calmed down when he saw that a wreck was causing the backup.

Adams testified that when they arrived at the bus station, the appellant got out of the passenger side and immediately went to the trunk. Adams said that the appellant got two bags, that he got the remaining bags, and that they went inside. The State played the video from the bus station for Adams, and he acknowledged that the video showed that the appellant got three or four bags out of the trunk and that he got two bags. Adams said he talked with the appellant briefly in the bus station and left. Later that day, he learned that the police were looking for a man who may have used a Dickson County cab. Adams contacted the police and told them about the appellant.

Shannon Brown Kullman testified that on the night of April 1, 2011, she was working at the front desk at the Comfort Inn in Dickson. Kullman identified a receipt showing that the appellant rented a room at 8:56 p.m. and gave a California address. Jesse Hedgepath testified that he was working at the hotel on April 2. He identified a document showing that the appellant checked out of the hotel at 4:43 a.m.

Deputy Jim Gardner of the Dickson County Sheriff's Department testified that on April 2, 2011, he was dispatched to the Pilot truck stop to look for the victim's car, a Dodge Caliber. Gardner found the car parked in a high-traffic area in front of the building. The car was locked, and the keys were on the seat.

Sergeant Dwyane West of the Jackson, Mississippi Police Department (JPD) testified that on April 2, 2011, he and three other officers were dispatched to the Greyhound bus station to look for a Tennessee suspect. The suspect was supposed to be on bus 7050 arriving from Dickson. Sergeant West saw the bus in the bus station parking lot. When he and the officers went inside the station, they saw the appellant, who matched the suspect's description. The appellant told the officers that his name was Edgar Ray Pew. Sergeant West said that when the officers tried to put handcuffs on the appellant, the appellant "resisted a little bit." The officers put the handcuffs on him and put him into a patrol car. They also collected his bags. The appellant had three bags stored in the compartment under the bus. The officers checked the appellant's seat on the bus but did not find any additional bags. Sergeant West said that the appellant was a "pretty nice sized guy," weighing 215 to 250 pounds, and that he did not see any injuries on the appellant.

Officer Leica Coleman of the JPD testified that she also went to the Greyhound bus station on April 2. The officers confiscated three bags, and the appellant did not appear to have any injuries.

-6-

Brenda Bradbury testified that she was part-owner of the East Dickson Mobile Home Park. In April 2011, the victim had been managing the park for about three years. Bradbury said the appellant did an excellent job, and Bradbury never saw the victim exhibit any dizziness or aggressive behavior. However, the victim could be stern and sometimes helped evict tenants. On the morning of April 1, 2011, Bradbury went to the trailer park office "to check on things" and give the victim her paycheck, which was about $500. Bradbury said the appellant was there, which bothered her because she "didn't want people sitting in the office, unless it was a tenant." The victim told Bradbury how much rent she had collected, and Bradbury was concerned because "normally Frankie did not tell that sort of thing in front of anyone." When Bradbury got home, she told her husband about her concern. About 9:15 a.m. on April 2, 2011, Ron Pew, the park's maintenance manager and one of the appellant's brothers, telephoned Bradbury and told her that the victim was not at the office.

On cross-examination, Bradbury testified that someone named Danny had lived in the appellant's trailer prior to the appellant and owed a lot of money. Defense counsel asked Bradbury if the appellant looked like Danny, and she answered, "Most likely." Bradbury acknowledged that Ron Pew made a $1,500 bank deposit for the victim on April 1.

On redirect examination, Bradbury testified that Pew probably made the deposit before 3:00 p.m. and that the victim may have received more cash after that time. Most tenants paid their rent in cash.

Donna Merrill testified that in the spring of 2011, she lived in the trailer park and knew the victim very well. The victim would drive through the park every morning, return home to get ready for work, and go to the park office. On the morning of April 1, 2011, Merrill saw the victim drive through the park as usual. However, she did not see the victim drive through the park on the morning of April 2. Merrill telephoned the victim's home and left a message, walked to the park office, and saw Ron Pew. Pew was not concerned about the victim and said he did not know where she was, which Merrill thought was odd because he and the victim kept in constant contact with each other. Later that day, Merrill heard sirens and went to the victim's house. Merrill said Pew came out to the "fence line" and stated that "they killed her, they killed her." Merrill said the victim would do anything for anyone and would believe any "sob story" someone gave her. The victim was four feet, five inches tall and weighed ninety pounds, and Merrill never saw her act in an aggressive manner. However, the victim "could write some mean notes" and used profane language "[h]ere and there."

Fifty-seven-year-old Ron Pew testified that he was the appellant's younger half brother and that he and the appellant had three other brothers: Delbert Bettis, Don Pew, and Edward Maples. The appellant occasionally went by the name Edgar Pew. At the time of

the victim's death, the appellant and Delbert[1] were living in a trailer behind the victim's house and were planning to leave Tennessee.

Pew testified that he was the maintenance manager for the East Dickson Mobile Home Park and worked closely with the victim. On the morning of April 1, 2011, he saw the appellant talking with the victim in the park office. About 11:30 a.m., Pew drove the appellant to Walmart to withdraw some money. The appellant went into Walmart and bought luggage, but Pew did not go in with him. About 3:00 p.m., Pew made a bank deposit for the trailer park. About 5:30 p.m., he returned to Walmart. He said he last saw the victim alive about 4:00 p.m

Pew testified that on the morning of April 2, he noticed that the victim was not at the trailer park office. He opened the office and waited for her, but she never arrived. About noon, Pew telephoned Brenda Bradbury. Bradbury told him to go to the victim's house and check on her. Pew told Bradbury that the victim's car was not at the victim's home, but Bradbury told Pew to check on her anyway. Pew went to the victim's house and saw that the back door was open slightly, which was unusual. He went inside and found the victim lying on the floor behind a chair. He touched her, discovered she was stiff, and called 911. He said that the victim was "a nice lady, to an extent" and that the victim "would do anything for just about anybody, but she did have her mean streaks." The victim was not physically violent and did not carry a weapon but cursed at people.

On cross-examination, Pew testified that the appellant and Delbert each paid half of the $500 rent. The appellant also paid $10 for water. Pew said the appellant "got along great" with the victim and acknowledged that on April 1, the appellant was going to ask the victim to "work with him on the rent." About 11:00 a.m., the appellant went to the office, talked with the victim, and asked if he could talk with her again later. Pew acknowledged that someone named Danny had lived in the appellant's trailer prior to the appellant and had left the trailer park owing a lot of money. Pew said that after the victim's husband died, she would "kind of space out" at times and seemed confused. Pew acknowledged that he also saw the appellant "zone out" a few times.

Edward Maples, the appellant's fifty-one-year-old brother, testified that he had recently returned to Tennessee after being in California for a parole violation. In April 2011, Maples was living with the appellant and Delbert, who were renting a trailer from the victim. Maples said he stayed inside the trailer because he was wanted in California for the parole violation and did not want to be seen. The appellant carried a stun gun on his person most

---

[1]Because the appellant and Delbert Bettis share the same last name, we will refer to Delbert Bettis by his first name for clarity.

of the time and had been planning to leave town.

Maples testified that on April 1, 2011, he stayed inside all day. He saw the appellant about 10:00 a.m. At first, Maples said that he did not see the appellant for the rest of the day. However, he then stated that he saw the appellant again at 4:30 p.m. The appellant told Maples that he was going to talk with the victim and left the trailer. The appellant returned to the trailer about 10:00 p.m. and told Maples, "I done it." The appellant told Maples that he killed the victim and that "she deserved what she got." The appellant was sweaty and was wearing slip-on shoes, jeans, and a light blue shirt. He took a shower, changed clothes, and started packing his bags. Early the next morning, the appellant left in the victim's car. Maples acknowledged that he gave a statement to police on April 2. According to the statement, Maples saw the appellant about 5:30 a.m. that day. The appellant was wearing gloves and different clothes, and blood was on the gloves. The appellant had a white trash bag and a small bag. He took off his clothes and threw them in a corner. The appellant had two duffle bags packed, and he packed a third bag. The appellant put jewelry, cash, the gloves, and his stun gun in the third bag. The appellant told Maples that "if anybody tells and stuff," he would have the person "taken care of." Maples said that he took the appellant's statement as a threat and that he was scared.

On cross-examination, Maples acknowledged that the victim's vision was poor. He also acknowledged that he was facing four years of confinement in California for the parol violation, but he denied testifying against the appellant to help his case. Maples said he saw the appellant change gloves several times on April 2. He acknowledged that he told the police that he saw a woman and her boyfriend go into the victim's home before the victim's body was found and that they stayed in the home for ten to fifteen minutes.

On redirect examination, Maples showed the jury his California "parole release card," showing that his parole violation case had been discharged. On recross examination, Maples acknowledged that he had told some lies in this case. He said he lied due to threats he received.

Delbert Bettis, the appellant's brother, testified that in April 2011, he and the appellant lived together and "split the rent," which was $500. He said that "the water was paid, but we split that with [the victim]." Delbert usually paid his share of the rent at the park office. However, he paid the victim at her home once or twice. Delbert said he and the appellant got along "for a while, until [the appellant] started getting all these . . . scam letters and everything. [The appellant] was wanting to borrow money from everybody to send off." Prior to the victim's death, Delbert and the appellant had talked about leaving Dickson. However, "all of a sudden [the appellant] changed his mind and said he was going to stay there one more month, and he was going to talk to [the victim] about arranging some rent or

something like that." On April 1, Delbert saw the appellant about 2:30 p.m. Delbert had a headache and went to sleep. Later, Edward Maples woke him and told him that the appellant was gone. About 5:25 p.m., Delbert telephoned the victim. She did not answer, and Delbert did not leave a message. He telephoned her again about 5:45 p.m., and she still did not answer. The next morning when Delbert awoke, Maples told him that the appellant had not returned. Delbert walked to the store and noticed that the victim's car was not at her home.

On cross-examination, Delbert acknowledged that on the morning of April 2, 2011, Maples did not tell him that Maples had seen the appellant with bloody gloves or that the appellant had claimed he killed the victim. In fact, Maples told Delbert that he did not know where the appellant was. In 2006, the appellant had had quadruple bypass heart surgery. Delbert said he had seen the appellant exhibit "some confusion." However, he never saw the victim exhibit any confusion.

Brian Johnson testified that in April 2011, he was the Chief of Police in Burns, Tennessee. On April 1, Johnson went to the victim's home and worked with Agent Craig. Johnson also went with Agent Craig to Jackson, Mississippi, to interview the appellant. At first, the appellant acted like he did not know why the officers were there. However, the appellant then told the officers the following: The appellant thought the victim carried a .38 caliber pistol. He hit victim on the head with an ashtray a couple of times and "tased" her. He also grabbed the victim by her head or her hair. However, that did not stop her, and she "came at him with the [yellow] pencil." The appellant grabbed the victim's neck and squeezed it. During their struggle, the victim tried to pry the appellant's fingers off of her. The appellant became angry and choked the victim until she stopped breathing. After the appellant released the victim, he took her car. He changed clothes, went to the Comfort Inn, and showered. The appellant left the victim's car with the keys in it at a truck stop and called a taxi. Johnson said that about fifteen minutes into the interview, the appellant started crying. At the conclusion of the interview, Johnson shook the appellant's hand. He said that the appellant had a strong grip and that he and Agent Craig collected three or four of the appellant's bags.

On cross-examination, Johnson testified that the appellant claimed that he went to the victim's house to pay his share of the rent, that he only had one-half of his rent, and that the victim got upset. The victim referred to Danny, said she "wasn't going through that again," and "came at" the appellant with the pencil. Johnson acknowledged that the appellant claimed "he kept trying to get her to stop." Johnson also acknowledged that he did not know if the appellant actually "tased" the victim.

Adele Lewis, the Deputy Chief Medical Examiner for Davidson County, testified as an expert in forensic pathology that Dr. Thomas Deering performed the victim's autopsy, that

Dr. Deering was unavailable to testify, that she had reviewed Dr. Deering's autopsy report, and that she agreed with Dr. Deering's findings. The victim was four feet, eleven inches tall and weighed one hundred eight pounds. She had multiple cuts on the top of her head that appeared to have been caused by her head being struck by a blunt object or her head striking a blunt object. She also had scrapes across her forehead and left eye, multiple abrasions on her left cheek, and bleeding deep under her scalp. The victim's head and face injuries were consistent with her having been hit with an ashtray. Bruises and scrapes on the backs of her hands could have been defensive wounds. The victim had an injury behind her left ear that was possibly a stab wound from a pencil. She also had an injury to the back of her left ear, and it was probably caused by an object or hand hitting her ear. The victim had a puncture wound on the tip of her chin and abrasions on her jaw that were caused by blunt force trauma such as a fist hitting her face. Dr. Lewis acknowledged that the wounds also could have been caused by the victim's own fingernails as she tried to get the appellant's hands off her neck. The victim did not have any skull fractures.

Dr. Lewis testified that the victim's injuries could have rendered her unconscious but that they were not fatal. She said that Dr. Deering "paid special close attention to the muscles and the soft tissues and the bones of the neck. Specifically, he did a very detailed dissection of these, looking for any injuries." Dr. Deering found a fracture in one of the bones in the victim's larynx and bleeding around the broken bone. The State showed a black and white photograph of the victim's larynx to the jury, and Dr. Lewis said the photograph showed broken thyroid cartilage on the left side. Dr. Lewis explained that a significant amount of force must have been applied to the victim's neck and that such an injury was more frequently seen in strangulation by hand than strangulation by an object such as a rope. The victim also had bite hemorrhages on her tongue, suggesting that she bit her tongue during her struggle with the appellant. Dr. Deering's report stated that the victim's cause of death was "multiple modality trauma," which Dr. Lewis described as a "term that encompasses the fact that this lady not only was . . . beaten or struck with something, but also strangled. Another way to have put it would have been blunt force injuries to the head and strangulation." However, "[t]he actual terminal event was the strangulation." Dr. Lewis said that strangulation for at least thirty seconds caused unconsciousness and that strangulation for two to four minutes caused death.

On cross-examination, Dr. Lewis acknowledged that she did not know if the victim was attacking someone at the time of death and that the wounds on the back of the victim's hands could have been offensive wounds. She also acknowledged that an older person's larynx was easier to break than that of a younger person. The victim could have died from strangulation in one to two minutes.

At the conclusion of Dr. Lewis's testimony, the State rested its case. The appellant

did not present any proof, and the jury convicted him of first degree premeditated murder as charged; second degree murder as a lesser-included offense of first degree felony murder committed in the perpetration of theft; and unauthorized use of an automobile, also known as joyriding, as a lesser-included offense of theft. The trial court merged the second degree murder conviction into the first degree murder conviction and sentenced the appellant to life. For the joyriding conviction, a Class A misdemeanor, the trial court sentenced him to eleven months, twenty-nine days to be served concurrently with the murder conviction.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support his murder convictions because the evidence shows that he went to the victim's home to pay his rent and that the victim attacked him. The appellant notes that there is no evidence to indicate that he took a weapon with him for the purpose of killing the victim, that he wore gloves during the killing, or that he had a motive to kill the victim. The appellant also notes that, according to Agent Craig, (1) nothing in his investigation showed the appellant went to the victim's house to kill her, (2) the appellant claimed he thought the victim carried a .38 caliber pistol, and (3) the appellant claimed he only intended to "choke her down." The State argues that the evidence is sufficient. We agree with the State.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012); see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. See Wagner, 382 S.W.3d at 297; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The jury, as the finder of fact, is responsible for assessing the credibility of the witnesses, deciding the weight to accord their testimony, and reconciling any conflicts in the proof. See Wagner, 382 S.W.3d at 297; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). On appeal, this court cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. See Wagner, 382 S.W.3d at 297; Cabbage, 571 S.W.2d at 835. A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of both. "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331

S.W.3d at 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a). Premeditation involves "an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). "It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. "Premeditation may be proved by circumstantial evidence." State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008). "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d)). A defendant's use of a deadly weapon against an unarmed victim, a lack of provocation on the part of the victim, a defendant's failure to provide aid or assistance to the victim, and a defendant's calmness soon after the killing are all established factors from which a jury may infer premeditation. See Brooks, 249 S.W.3d at 329; Leach, 148 S.W.3d at 53-54. Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20).

The trial court instructed the jury on self-defense. Our Code provides that the use of force likely to cause death or serious bodily injury may be justified when a person (1) "has a reasonable belief that there is an imminent danger of death or serious bodily injury"; (2) "[t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time"; and (3) "[t]he belief of danger is founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(2). Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

Taken in the light most favorable to the State, the evidence shows that the appellant went to the victim's home to talk with her about paying only a portion of his rent. The victim became angry with the appellant, they argued, and an altercation ensued. During the altercation, the appellant, who weighed over two hundred pounds, hit the victim, who weighed one hundred eight pounds, in the head several times with an ashtray and "tased" her. He then strangled the victim. Dr. Lewis testified that the appellant had to strangle the victim for at least thirty seconds in order to render her unconscious and that he had to strangle her

-13-

for two to four minutes in order to kill her. Although the appellant claimed that the victim attacked him with a pencil, the victim's autopsy report shows that she may have been stabbed with the pencil. The appellant was not injured during their altercation, and he did not render aid to the victim. Instead, he drove the victim's car to the Comfort Inn and spent the night. At some point, the appellant changed his clothes at his trailer and altered the crime scene. He drove the victim's car to the Pilot truck stop, called a taxi, hired Michael Adams to drive him to Nashville, and boarded a bus to Shreveport. Based upon the evidence, the jury could have found that the appellant killed the victim intentionally and with premeditation. Because the evidence is sufficient to show that the appellant acted intentionally, the evidence also is sufficient to show that he acted knowingly. See Tenn Code Ann. § 39-11-301(a)(2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). It was within the jury's province to reject the appellant's theory of self-defense. Thus, the evidence is sufficient to support the appellant's murder convictions.

## B. Dr. Lewis's Testimony

Next, the appellant contends that the trial court erred by allowing Dr. Lewis to testify outside the autopsy report because he had no notice that she was going to testify that strangulation was the specific cause of the victim's death or testify about how long the appellant had to strangle the victim in order to kill her. Thus, Dr. Lewis's testimony was "fundamentally unfair and a denial of Due Process." The State contends that the trial court properly allowed Dr. Lewis to testify. We agree with the State.

Before trial, the trial court filed an order stating that the parties had agreed that Dr. Lewis could testify for Dr. Deering if Dr. Deering was unavailable to testify at trial. During the trial, the State advised the trial court that it wanted the jury to see a color photograph of the victim's trachea, showing a cartilage fracture to the victim's larynx. Defense counsel argued that the bloody photograph was prejudicial and stated that "[t]his one injury will not be testified to that this was the single cause of death." The State countered that the photograph was not particularly gruesome and that the photograph was "of significant importance" to Dr. Lewis. The State announced that Dr. Lewis was "going to testify that none of the wounds to [the victim's] head were the cause of death. That upon reviewing Dr. Deering's autopsy, [Dr. Lewis is] going to opine that the cause of death was strangulation." Defense counsel argued that because Dr. Deering's autopsy report said the victim's cause of death was "multiple, modality, multiple wounds," not a crushed larynx, "we've got a real problem if they're going to bring in somebody to testify differently than what this is. We've not agreed to that." The trial court reviewed the agreed order and stated as follows:

> The autopsy report, as has been stated, states the cause of death -
> or the best cause of death - as multiple modality traumas. And

-14-

it lists several injuries here to the head and to the larynx. Assuming that the expert stays roughly close to this autopsy report, I don't see a problem with it. . . . So I would think that would be within her purview of testifying.

The trial court also ruled that the State could show a photograph of the victim's larynx to the jury. However, the trial court ordered that the State show the jury a black and white photograph.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing Murray v. State, 377 S.W.2d 918, 920 (1964); Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). This court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in admitting or disallowing expert testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). We will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Stevens, 78 S.W.3d at 832 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Turning to the instant case, Dr. Deering's report states that a forensic neck dissection revealed "hemorrhages around the left posterior larynx and there was a fracture of the superior cornu of the larynx." The report also states that "the best cause of death is multiple modality trauma. The neck injuries may have been caused by strangulation. The manner of death is homicide." Thus, the appellant was aware that strangulation was going to be an issue at trial. The appellant agreed that Dr. Lewis could testify about the autopsy report in the event of Dr. Deering's absence, and Dr. Lewis testified at trial, without any objection from the appellant, as an expert in forensic pathology. Therefore, we cannot conclude that the trial court abused its discretion by allowing Dr. Lewis to testify about strangulation as the victim's specific cause of death or about the amount of time required for the appellant to have strangled the victim to death.

In a related argument, the appellant contends, "If the expert witness should have been barred from testifying, then the photographs of the esophagus or voice box should not have come in either." However, because we have concluded that the trial court did not abuse its discretion by allowing the pathologist to testify, there is no merit to the appellant's claim that the photograph was inadmissible.

## III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.


_____
NORMA McGEE OGLE, JUDGE