IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2015 at Jackson

## STATE OF TENNESSEE v. KENNY THOMASON

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-68120     David M. Bragg, Judge**

---

**No. M2014-00592-CCA-R3-CD – Filed January 28, 2016**

---

A Rutherford County Circuit Court Jury convicted the Appellant, Kenny Thomason, of first degree premeditated murder, and the trial court sentenced him to life imprisonment. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, claiming that the State failed to prove premeditation or that he possessed the weapon that killed the victim; instead, he asserts that the victim possessed the weapon and that she was killed during a struggle. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., joined. JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

Gerald L. Melton, District Public Defender; and Jeffrey S. Burton and Sean G. Williams, Assistant Public Defenders, for the Appellant, Kenny Thomason.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

A Rutherford County Grand Jury indicted the Appellant for the first degree premeditated murder and felony murder of the victim, Kimberly Kuhlman. The crimes occurred at the residence of Kimberly Burke, who was the Appellant's ex-wife. The Appellant was also indicted for the aggravated assault of Ms. Burke.

Kimberly Burke testified at trial that she moved to Tennessee from Kentucky in 1992 because of a job. At that job, she met the victim's husband, Jamie Kuhlman, and she became friends with him and the victim. Ms. Burke met and married the Appellant in 1999. Ms. Burke said that the Appellant was employed during most of their marriage. They divorced on May 31, 2011. Ms. Burke said that a couple of years before the divorce, the Appellant's personality changed; he was angry most of the time, would not socialize, and stopped being friendly and outgoing. The divorce decree provided that an existing order of protection would remain in effect until May 31, 2012; the order of protection prohibited the Appellant from owning firearms. Ms. Burke said that the decree further provided that the Appellant had thirty to forty-five days to retrieve his personal belongings from the house but that he never did.

Ms. Burke said that the marital home was in her name and that after the divorce, she lived alone in the house. On Monday, August 1, 2011, she returned home from work, walked through the garage, and started to open the door from the garage to the house. The Appellant, who was in the house, pulled the door open, grabbed her, and pulled her into the house. Ms. Burke was upset because she had not expected the Appellant to be there. She told him to leave, and he hit her with his open hand. The Appellant told her that he was going to make her suffer, that he was going to burn down the house, and that she would watch him "bleed out." Ms. Burke thought the Appellant intended to kill himself. The Appellant told her that she should not have divorced him.

Ms. Burke said that she told the Appellant his belongings were packed in boxes in the garage. The Appellant walked into the garage and retrieved some photographs of his family from the boxes. He said that he did not need any of the other things in the boxes and proceeded to burn the photographs in the fire pit behind the house. Ms. Burke worked from home the next day while the Appellant slept in a downstairs bedroom. Although Ms. Burke repeatedly asked the Appellant to leave, he stayed at the residence until August 7. During that time, the Appellant never left the residence alone. Ms. Burke left occasionally to go to work or to the store.

Ms. Burke recalled the Appellant said that someone else had his driver's license. Ms. Burke knew he needed identification to obtain employment and offered to drive him to get his license. He declined her offer, and when Ms. Burke retrieved the license and gave it to him, he said he did not need it.

Ms. Burke said that on August 3, she called her sister, Donna Huff, who lived in Lexington, Kentucky. She told her sister that the Appellant was staying with her, and her sister became upset. Her sister and brother-in-law wired $1,000 to Ms. Burke's bank account so the Appellant could get "back on his feet" and leave. After the money arrived, Ms. Burke withdrew the cash from the bank. When she told the Appellant about the

money, she explained it was to be used for temporary housing and transportation while he looked for a job. The Appellant did not want to accept the money unless Ms. Burke was willing to reconcile. Nevertheless, the Appellant told Ms. Burke on two occasions to use the money to buy beer and to pay for their meals at a Mexican restaurant.

Ms. Burke said she told the Appellant to leave the house; however, she ultimately decided to let him stay and rest before talking with him about "trying to get back on his feet." She explained that she loved him and hoped he would decide to make a fresh start without her. She noted that the Appellant was unemployed and did not own an automobile or a boat. The Appellant told her that if she did not resume their relationship, he "wanted to become a homeless person."

Ms. Burke said that on Friday, August 5, she told the Appellant that he had to leave the following Sunday. The Appellant packed a duffle bag with some of his belongings from the garage and said again that he intended to live as a homeless person. At approximately 1:00 or 2:00 p.m., they left the residence and decided to eat at a Mexican restaurant. While at the restaurant, they each drank a couple of beers. When they left the restaurant, the Appellant, who was driving, stopped at a convenience store and purchased a pack of Budweiser. Between 5:30 and 6:30 p.m., he drove to the Hamilton Creek area around the bike ramp and the boat docks on Percy Priest Lake. Ms. Burke offered the Appellant the balance of the money that her sister and brother-in-law had sent, which was $708, but he refused to take it. He got out of the vehicle, grabbed his bag, and walked toward the wooded area. The Appellant left his wallet, which contained his driver's license, in her purse. She recalled that a Tiger Mart was within walking distance of the area where she left the Appellant.

Ms. Burke said that after she left the Appellant, she drove home. Along the way, she tried to call the victim but accidently called a friend, Sherry Coy, who lived in Florida. Ms. Burke told Mrs. Coy "what had happened that week." Mrs. Coy told her husband Daniel, who became concerned and called the Lavergne Police Department. After speaking with Mrs. Coy, Ms. Burke called the victim. The victim was upset and told Ms. Burke that she was coming to Ms. Burke's house. Ms. Burke tried to discourage the victim, but the victim insisted.

When she got home, Ms. Burke called her sister in Kentucky. Their conversation ended when Lavergne police officers arrived to check on Ms. Burke. Ms. Burke told the officers that she had left the Appellant in the Hamilton Creek area and asked them "to keep an eye on the house." She stated that she did not believe the Appellant would return but was not sure "after everything that had happened." She could not remember whether the police told her to leave the porch light on or off to alert them to any problems.

Ms. Burke recalled that the victim arrived at her home between 7:00 and 7:30 p.m. that evening. Ms. Burke drank some beer before the victim arrived, and after the victim arrived, they sat on the porch and each drank several beers. Ms. Burke stated that the victim was not intoxicated or out of control.

Ms. Burke stated that while they were sitting on the porch, the police drove by once. Ms. Burke said she had "misunderstood" the "light situation," and the officers thought something might be wrong. However, the women waved to the officers to let them know everything was fine.

Ms. Burke said that around 9:00 or 9:30 p.m., the Appellant arrived in a cab. He was dressed in jeans, a t-shirt, and a cap. The cab left immediately after the Appellant got out, which indicated to Ms. Burke that the Appellant was not planning to leave. The victim, who was holding her cellular telephone, called 911 and told the Appellant to leave. The Appellant walked up the driveway and stood in front of the porch. He said that he was there to retrieve his money and identification. The victim again told the Appellant to leave and also told Ms. Burke to go inside the house. Ms. Burke said that the Appellant appeared calm. Ms. Burke went into the house to get the Appellant's money. Once inside, she used the house telephone to call 911. While on the telephone, she heard the Appellant and the victim arguing. Ms. Burke returned to the front door and saw the victim lying on the porch. Ms. Burke believed that the Appellant had shoved the victim. Ms. Burke was pushing the Appellant backward when Officer Crotts approached the Appellant from behind and subdued him.

Ms. Burke said that she knelt beside the victim and noticed that the victim was covered in blood. Officer Crotts told another officer to take Ms. Burke inside the house so he could take care of the victim. Ms. Burke went inside the house with the officer and stood in the living room, just inside the front door. Ms. Burke stated that she thought the Appellant would hurt someone but did not anticipate that he would hurt the victim, noting that the victim and the Appellant had been friends.

Ms. Burke said that in the one and one-half to two years prior to the divorce, she had called the police to her residence on more than one occasion because of the Appellant. Firearms were involved on each of those occasions. She said that each time, the police removed the Appellant from the house, but he always returned. She explained that the prior incidents influenced her decision not to call the police while the Appellant was at her house between August 1 and August 7.

Ms. Burke stated that after she found the Appellant in her house on August 1, she noticed that the back door of her house was damaged; the door had not been damaged when she left for work that morning, and she had locked the doorknob lock and the deadbolt lock. Although the door could still be closed and locked after it was damaged,

- 4 -

Ms. Burke opined that the door would not have been strong enough to keep the Appellant out of the house on August 7.

Ms. Burke said the Appellant collected knives and owned more than one knife. The pocketknife found in her doorway after the stabbing was a present from her brother-in-law to the Appellant. Ms. Burke did not see the Appellant with a knife on the night of the offense; however, he routinely carried a knife. She denied that either she or the victim had a knife on the night of the offense. She said that after the offense, she found the case for the knife on the garage floor between the boxes of the Appellant's belongings and the stairs to the entrance of the house. Ms. Burke said that neither she nor the victim had rummaged in the Appellant's belongings in the garage but that the Appellant had ample opportunity to go through the boxes during the week prior to the offense.

On cross-examination, Ms. Burke said that on Monday, August 1, the first night the Appellant was in her house, she and the Appellant had consensual sexual intercourse. Ms. Burke could not recall whether she had sex with the Appellant more than once that week. On Tuesday, she worked from home on her laptop while the Appellant slept all day. When he woke, they talked about their divorce. Ms. Burke went to work on Wednesday. While there, she called her sister and told her that the Appellant was staying at Ms. Burke's house. She said that she went to work again on Thursday. Ms. Burke stated that throughout the week, she told the Appellant that he had to leave by a certain day; however, she usually postponed the date because she cared about him and wanted to help him "get back on his feet."

Ms. Burke said that she knew the Appellant left the money the Huffs sent and his identification in her vehicle when she left him in the Hamilton Creek area. When the Appellant came to Ms. Burke's house later that night, the victim was angry and upset with the Appellant for "breaking in and everything he had done to [Ms. Burke] for the past two years." Ms. Burke went inside the house to get the money and the identification, hoping the Appellant would leave. When she returned to the porch and saw the victim lying on the floor, she thought the Appellant had pushed the victim. Ms. Burke shoved the Appellant, then Officer Crotts stepped in and apprehended the Appellant. Ms. Burke did not see anything in the Appellant's hands. Ms. Burke stated that the Appellant had taken some of his clothes from the boxes but that she did not know whether he had taken any of his knives.

On redirect examination, Ms. Burke explained that she had sex with the Appellant after he broke in her house because she had been drinking, still cared about him, and "was intimidated with just him being there." She denied that the Appellant raped her or threatened her.

Wanda Gannon, a 911 operator with the Lavergne Police Department, testified that around 5:00 p.m. on August 7, 2011, a man called to report that he had information that led him to believe Ms. Burke was in an unsafe "domestic situation." The shift supervisor was notified, and a "welfare check" was arranged for Ms. Burke's residence.

Ms. Gannon said that later, at 9:33 p.m., 911 received a call from the victim, advising that the Appellant was at Ms. Burke's residence. Officers were immediately dispatched to the scene and arrived approximately twenty seconds later. Ms. Gannon said that she heard the victim talking with the Appellant in the background. The victim sounded agitated, not aggressive.

A recording of the victim's call to 911 was played for the jury. During the call, the victim told the 911 operator that the Appellant was "right outside" and that she did not believe he was armed. In the background, the victim told the Appellant that she could not believe he would treat Ms. Burke so badly and told Ms. Burke to go inside the house. The victim told the 911 operator that the Appellant was wearing a baseball cap, a sleeveless shirt, and jeans. The victim told the Appellant, "You are not getting in this house, and if you get in this house, 911 is on the phone, and they're going to know that you hurt me." Immediately thereafter, the victim repeatedly screamed "ow" amid sounds of a struggle.

Donna Huff, Ms. Burke's sister, testified that she lived in Louisville, Kentucky. Ms. Huff said that she and Ms. Burke had a close, loving relationship. Ms. Huff said that sometime after Ms. Burke and the Appellant married, she began to fear for Ms. Burke's safety.

Ms. Huff said that on August 3, 2011, Ms. Burke called her and said that the Appellant had broken into her house two days earlier. After the call, Ms. Huff and her husband decided to wire $1,000 for the Appellant to Ms. Burke's account so he could have a new start and leave Ms. Burke alone. Ms. Huff explained that the Appellant needed money because he did not have a job. She said that $1,000 was a "lot of money to" her but that she was willing to send it to "ensure the safety of [her] sister." She sent the money on August 4, and she called Ms. Burke the next day to confirm that the money had arrived.

Ms. Huff said that she next spoke with Ms. Burke on Sunday, August 7. Ms. Burke said that the Appellant had requested she drive him somewhere. Afterward, Ms. Burke called Ms. Huff and said that the victim was going to spend the night with Ms. Burke. The Lavergne Police Department called Ms. Huff early the next morning and advised her of the incidents leading to the victim's death.

On cross-examination, Ms. Huff said that on August 3, Ms. Burke told her that she let the Appellant move in for a week so he could rest and "clean up" before seeking employment. When Ms. Huff suggested giving the Appellant money, Ms. Burke agreed. Defense counsel asked Ms. Huff why giving the Appellant money was a better idea than calling the police. She explained:

> We felt that at this point there had been a lot of instances in the past that involved the police. . . . [The Appellant] is smart. [He] thinks, and [he] would figure out a way to avoid the situation. . . . [W]hen you would try to make [him] pay, maybe, for something he had done, [he] always came out of it somehow.

Ms. Huff said that Ms. Burke told the Appellant about the money and that he would not accept it.

Officer Timothy Scott Hudgens testified that around 6:15 p.m. on August 7, 2011, he was dispatched to Ms. Burke's residence because of a possible violation of an order of protection. When Officer Hudgens spoke with Ms. Burke, she said that she came home from work one day and discovered that the Appellant had kicked the back door open and was inside the residence. She showed the officer the damage to the door and told him that she had feared for her safety and that she had allowed the Appellant to stay in the house until August 7 when she drove him to a park in Nashville and left him there. Ms. Burke was upset but did not want to press charges against the Appellant; nevertheless, she wanted him out of her life. Officer Hudgens and Corporal Locklear, who was also at the scene, told her they would drive by her residence several times that evening. They advised her to leave the front porch light on if everything was fine and to turn it off as a signal to the police that the Appellant had returned to the house.

Officer Hudgens said that he drove by Ms. Burke's residence several times that night. At approximately 8:36 p.m., he saw Ms. Burke and the victim on the front porch. He stopped to check on them, and Ms. Burke said that the victim planned to spend the night with her.

On cross-examination, Officer Hudgens said that it was light outside when he spoke with Ms. Burke at 6:15 p.m. Ms. Burke told him that she was afraid the Appellant might return to the house, then she explained that the Appellant had broken into her house earlier that week by kicking in the door. Ms. Burke showed Officer Hudgens the damage to the door, and he opined that the damage was consistent with Ms. Burke's version of events. Officer Hudgens recalled that the light was off when he drove by and saw Ms. Burke and the victim on the porch. They said everything was okay and thanked him for checking on them. Officer Hudgens did not remind them that the light being off

was supposed to be a signal of trouble. He recalled that both women seemed to be in a good mood. They did not appear to be intoxicated. He noted, however, that he spoke to them from the street, which was approximately thirty feet from the porch.

Lavergne Police Officer Steve Crotts testified that on the night of August 7, 2011, he was dispatched to Ms. Burke's residence. When he arrived, he heard a female screaming. He exited his patrol car and ran toward the front porch. He saw the Appellant and Ms. Burke "arguing and struggling" in the doorway of the house. Officer Crotts said that "[i]t looked like [the Appellant] was trying to hit or strike [Ms. Burke] in the doorway." The victim was lying on the porch, covered in blood. Officer Crotts said that he "picked [the Appellant] up and carried him backwards over a railing onto the ground." Thereafter, Officer Crotts handcuffed the Appellant. Other officers began to arrive, and Officer Crotts asked one of them to put the Appellant in the back of Officer Crotts's car.

After the Appellant was subdued, Officer Crotts went to help the victim. He said that the situation was "chaotic" and that Ms. Burke was screaming. Because of the amount of blood on the victim, Officer Crotts could not see where she was hurt, so he asked where she was injured. The victim responded that her neck was hurt. Officer Crotts obtained a towel and applied pressure to the wound to stop the bleeding. Soon thereafter, members of the fire department arrived to assist the victim. Officer Crotts said that another officer found a knife inside the house.

On cross-examination, Officer Crotts said that he was unsure whether the woman he heard screaming upon his arrival was Ms. Burke or the victim. Officer Crotts said that the Appellant and Ms. Burke were arguing and "struggling" in the doorway. Officer Crotts did not notice whether the Appellant had blood on him at the time he was apprehended. Officer Crotts said that another officer found a silver pocketknife a couple of feet inside the house.

On redirect examination, Officer Crotts said that Ms. Burke was not calm at the scene. The Appellant appeared calm; he never cried or seemed upset.

Lavergne Police Officer Owen Ward testified that when he arrived at the scene, Officer Crotts was already there. At the behest of Officer Crotts, Officer Ward assumed custody of the Appellant. Officer Ward patted down the Appellant, looking for weapons. Finding none, he placed the Appellant in a patrol car. Officer Ward said that the Appellant's demeanor was "very calm" and that the Appellant did not speak to him. Afterward, Officer Ward cordoned off the crime scene.

On cross-examination, defense counsel asked Officer Ward if the Appellant was "in shock." Officer Ward responded, "He was just quiet."

Sergeant[1] William Charles Timson said that when he arrived at the scene, he saw Officer Crotts pass the Appellant into the custody of another officer. The victim was lying on the porch, bleeding from her left side. Sergeant Timson went into the house to find a towel to press on the victim's wound. Sergeant Timson said that he also ushered Ms. Burke into the house. Sergeant Timson heard Officer Crotts mention a knife, and he told Officer Crotts that he saw a knife lying on the floor of the foyer just inside the door. Sergeant Timson said that with that particular knife, the blade of the knife had to be opened but that once the blade was open, "it [would] stay open."

Officer Eric Staats testified that on the night of the offense, he went to Stonecrest Medical Center and photographed the deceased victim's body. He also collected the shirt and underwear the victim had been wearing; the clothing was covered with blood. Afterward, he proceeded to the crime scene to photograph and collect evidence. On the front porch, he saw a large reddish brown blood stain. Also on the porch were other, smaller blood stains and drops; four beer cans; a black Crocs flip flop; a black cellular telephone; and a white cordless telephone. In the foliage in front of the porch, he found another beer can and a black Crocs flip-flop. Inside the refrigerator were cases of beer, a six pack of beer in bottles, and a case of Diet Pepsi. Three empty cans of beer were on the kitchen counter. In the hallway, he found the Appellant's leather wallet, which contained $700 cash in a Bank of America envelope, $8 in loose cash, a Tennessee driver's license, an Oklahoma driver's license, a medical card, and a Social Security card. Officer Staats said that he collected a Case & Son Cutlery Company pocketknife from the scene. On the knife was an inscription reading "Louisville Locomotive." A case that matched the knife was found in the house, but Officer Staats did not specify where it was found.

Thereafter, Officer Staats photographed the Appellant in the booking room of the Lavergne Police Department. Officer Staats did not observe any injuries, but he noticed a stain that appeared to be blood on the Appellant's shirt.

Trevor Alan Milligan testified that on the day of the offense, he lived across the street from Ms. Burke. Late that afternoon, Milligan was sitting on his front porch when he saw a cab leave Ms. Burke's driveway. Milligan saw a man walk through Ms. Burke's yard. Ms. Burke and the victim, who were on Ms. Burke's front porch, told the man to leave. The man stopped on the front of the porch and then sat on the bottom step. When one of the women went inside the house, the man slowly walked up the steps. Milligan briefly glanced away but looked back when he heard a "bang" or "something like a scuffle . . . going on." He said the man and someone else appeared to be fighting on the porch. At that point, an officer arrived, ran to the porch, and grabbed the man.

---

[1] At the time of the offense, Timson was a corporal.

Later that night, Milligan told the police what he had seen. Thereafter, he identified the Appellant from a photograph lineup.

On cross-examination, Milligan stated that his front porch was located forty or fifty yards from Ms. Burke's front porch. Milligan heard one of the women begin speaking to the Appellant immediately after he got out of the cab. The Appellant appeared to be calm. Milligan said that he looked away from the porch because he did not think anything was going to happen and did not want to be "nosy."

Detective Kevin Stolinsky testified that on the night of the offense, he first responded to the hospital then went to the scene and spoke with Milligan. On August 16, Detective Stolinsky showed Milligan a photograph lineup, from which Milligan identified the Appellant. Detective Stolinsky stated that on September 28, 2011, he collected a buccal swab from the Appellant.

Joshua Wright, a paramedic with the Rutherford County Emergency Medical Service, testified that on the night of the offense, he and his partner, Chris Reid, were dispatched to the crime scene. When he arrived, the victim was lying on the porch, and a fireman was holding direct pressure on the stab wound to her neck. The victim had at least one stab wound to the neck, possibly two, and another stab wound to the chest. As quickly as possible, the paramedics transported the victim to the hospital.

Dr. Lori Eubank, a doctor at Stonecrest Medical Center, testified that the victim died shortly after she was brought into the emergency room.

Dr. Feng Li, the Senior Associate Medical Examiner for Metropolitan Nashville, testified that he performed an autopsy on the victim's body. The victim was forty-two years old, five feet and four inches tall, and weighed 123 pounds at the time of her death.

Dr. Li said that during the examination, he found multiple sharp force injuries, including stab wounds and cuts, to the body. The most severe wound was a four-inch deep stab wound to the left side of the chest, which injured the left lung and heart and caused blood to accumulate in the pericardial sac and left chest cavity. The wound had blunt edges on both sides, which indicated that a knife was inserted to "the hilt." The victim had two stab wounds on the side of her neck; one was one and one-half inches deep, and the other was one inch deep. The wounds had a blunt edge on one side and a sharp edge on the other side. Dr. Li said that the neck wounds would not have been fatal if immediately treated. The cause of the victim's death was multiple stab wounds, and the manner of death was homicide.

Dr. Li stated that toxicology testing revealed the presence of Phentermine, a stimulant typically used as a diet pill, in the victim's blood. The amount of medication

was consistent with therapeutic levels and would not have affected the victim's behavior. The victim had a blood alcohol content of .085, which was over the legal limit for driving. He was unsure of how the alcohol would have affected her behavior because he did not know how often she drank or her tolerance for alcohol. Nevertheless, he said that the amount of alcohol was consistent with someone who had consumed three or four beers.

On cross-examination, Dr. Li conceded that the amount of Phentermine in the victim's blood was more than would be expected if she had taken a daily dose of 30 milligrams a day. He acknowledged that the potential adverse effects of an elevated dose of Phentermine included "nervousness, tremors, confusion, headache, hallucinations, and psychotic episodes." Dr. Li acknowledged on redirect examination that he did not know the dosage the victim was taking.

David Howell, a latent print examiner with the Tennessee Bureau of Investigation (TBI) crime laboratory, testified that after the DNA/serology unit processed the knife, he examined it for fingerprints. He was unable to find a print with sufficient ridge detail to make an identification. He explained that the other unit's testing procedures could have affected his ability to find fingerprints. He further noted that the texture of the handle impeded his ability to find a fingerprint on the handle of the knife.

Heather Lenzy, a forensic scientist in the DNA/serology unit of the TBI crime laboratory, testified that she looked at the Appellant's shirt, blue jeans, and shoes and did presumptive testing for blood. The only blood she found was a spot on the shirt. She also examined the knife, and it tested positive for blood. The shirt and knife were sent for further testing.

Michael Turbeville of the TBI crime laboratory testified that he performed further testing on the Appellant's shirt and knife. The blood on the shirt and on the knife tested positive for the victim's blood.

Lieutenant Kyle Norrod of the Lavergne Police Department[2] testified that on August 8, 2011, he and Corporal Durham interviewed the Appellant at the police department. Prior to the interview, the Appellant was advised of and waived his Miranda rights. A recording of the interview was played for the jury.

During the interview, the forty-seven-year-old Appellant said that he went to Ms. Burke's house to get his driver's license and his money. He said that when he stepped out of the cab, "[S**]t went crazy." He said that the women were "p[**]sed off" when he arrived. The Appellant said that the victim had been friends with him and Ms. Burke.

---

[2] At the time of trial, Lieutenant Norrod was employed by the Rutherford County Sheriff's Office.

The Appellant acknowledged that Ms. Burke had a restraining order against him. He said that he had been at Ms. Burke's residence "all week" and that Ms. Burke had let him stay there. He said that Ms. Burke got his driver's license from a friend. The Appellant said that earlier in the day, he and Ms. Burke went to a Mexican restaurant, then she left him near the lake. He walked to a Tiger Mart, and someone there called a cab for him. He took a cab to Ms. Burke's house to get his identification and money. The Appellant explained that his brother-in-law had sent him the money, asserting, "It's my money; she's got it."

The Appellant said that as soon as he arrived, "[A]ll hell broke loose. It was already broke loose, I think." He maintained that he walked to the steps but was not on the porch. He thought that Ms. Burke was willing to give him his license and money. He said that the victim told Ms. Burke to get inside the house, and Ms. Burke complied. When the officers asked if that made him mad, the Appellant replied, "Well, hell yeah, it made me mad." The officers then asked if anything else happened after that, and the Appellant responded, "No. We had pretty much a good time." The Appellant maintained that he sat on the steps to wait for the police to arrive. The Appellant said that he was "mad because somebody was sitting there, screaming at me when I ain't done s[**]t to them, and it ain't none of their f[***]ing business." When asked how the victim sustained her injuries, the Appellant replied, "I don't have a clue." The police pressed, asking if the injuries occurred accidentally, and the Appellant asked, "What did she say?" The police said they wanted to hear the Appellant's side of the story, and the Appellant repeatedly responded, "I ain't got nothing to say."

On cross-examination, Lieutenant Norrod said that he thought the Appellant's statement about having a good time was "odd." Lieutenant Norrod thought the Appellant was referring to the incident at the house, not to anything that happened earlier that day. After the interview, Lieutenant Norrod told the Appellant that he was being arrested for murder. The Appellant had no response; he "was just stone cold." Lieutenant Norrod acknowledged that the Appellant was not "drenched in blood" when he was arrested, that there were no eyewitnesses to the stabbing, and that the police did not find the Appellant's DNA or fingerprints on the knife.

On redirect examination, Lieutenant Norrod reiterated that the Appellant was "[s]tone cold. No emotion at all, especially for someone that he had known for 12 or 13 years that had just been murdered." Lieutenant Norrod explained that a person would not necessarily be covered in blood after stabbing someone. He further explained that the police were not able to recover DNA or fingerprints in every case. He also stated that an eyewitness placed the Appellant at the scene at the time of the incident and that there were only three people on or near the porch when the stabbing occurred.

Retina Rucker testified that she was working at Tiger Mart on the night of August 7, 2011. The Appellant came inside the store that night, inquired as to whether the store had a telephone book, and asked for permission to use the telephone. When Ms. Rucker said that she had a telephone book, he asked her to look up "either Kim Thomason or Kenny or Kendall Thomason in Lavergne." He said that his truck and boat were "broke down" at the Thomasons' residence. Ms. Rucker found the number, but the Appellant's call was apparently unsuccessful. Ms. Rucker then offered to call a cab for the Appellant. The Appellant agreed and told her he was going "somewhere off of Nashville Highway in Lavergne." While the Appellant waited for the cab, a couple of people came inside the store, one of whom was a correctional officer. The Appellant asked both people to give him a ride and offered to pay for the transportation. After his offers were declined, the Appellant went to the restroom then stepped outside to wait for the cab. Before the cab arrived, the Appellant came back inside the store and attempted to buy beer, but Ms. Rucker would not sell it to him because he did not have identification with him. When the cab arrived, the Appellant left.

Ms. Rucker watched the security video and identified the Appellant. The video noted the time as 8:37 p.m.; however, Ms. Rucker said that the security video was "off" by one to three minutes. The Appellant left in the cab at 9:03 p.m. Ms. Rucker said that the Hamilton Creek Recreation Area was located approximately one-half a mile from the store.

On cross-examination, Ms. Rucker said that "[t]he only thing that was really unusual is when [the Appellant] asked for a telephone number to call his wife. If that's your wife, you should be able to get in touch with your wife." She stated that the Appellant appeared to be in a hurry and that he told her he was "stranded." The Appellant told Ms. Rucker that his driver's license was in his boat and that "[h]is boat and his truck was broke down together."

The Appellant chose not to testify or put on proof.

Regarding premeditation, the State told the jury during closing argument that it did not believe the Appellant went to Ms. Burke's house with the intent to kill the victim. Instead, the State argued that when the Appellant arrived at Ms. Burke's house, the victim "refus[ed] to let him do what he wanted to do," which made her "the obstacle." The State theorized that as the Appellant sat on the steps,

> his anger was building. And either while he was sitting on the steps or as was testified to, as he was walking calmly up the steps, that [the Appellant] – and you saw what he was wearing. Long shirt almost down to the knees, no pocket. Had to pull up that shirt, had to reach in that pocket, had to

take out that knife, had to open that blade, and had to do a
sneak attack on [the victim] and stab her not once, not twice,
but three times.  And he also attempted to cut her throat.

The State noted that during the 911 call, the victim said "you don't mess with someone I
love" and that she also told the Appellant, "I loved you, too."  The State theorized that the
victim did not think the Appellant would kill her and that he must have performed a
"sneak attack."  The State said:

> And I submit to you that as he was calmly walking up
> the steps coming toward [the victim], that that is what caused
> [the victim] to say, you can't come in this house.  I am on the
> phone with 911.  If you get in this house, they will know that
> you hurt me.
>
> And then seconds after that, you hear the sneak attack.
> You hear the screams.  You hear the scuffle.  It was a brutal
> attack.  It was a cowardly act.  It was first degree murder.

In response, the defense argued that the Appellant did not premeditate the killing.
Defense counsel noted that the Appellant asked a corrections officer for a ride to Ms.
Burke's house, which was incongruous with someone intending to commit a crime.
Defense counsel said that Ms. Burke did not act like someone who was afraid of the
Appellant, observing that she let him stay for a week, went to a restaurant with him,
bought him beer, and had sex with him.  Defense counsel maintained that the Appellant
had no reason to kill Ms. Burke or the victim.  Additionally, defense counsel noted that
Milligan did not see the Appellant raise his shirt or pull out a knife.  Defense counsel
contended that the victim, who had alcohol and a stimulant in her system, armed herself
with the knife to protect herself from a "potential threat" and that she ultimately was
killed during a struggle with the Appellant.  Defense counsel contended, "If those
wounds were delivered during an altercation with [the Appellant] at the top of the steps
and [the victim] produced the weapon, it's not first degree murder.  It's not second degree
murder, because there's no intent to kill her."

In response, the State said that the Appellant

> didn't form the intent to kill anybody at the Tiger Mart.  He
> didn't even know [the victim] was going to be there.  He was
> just going back to do what he had been doing.  Get back in
> the house. . . .
>
>      . . . .

- 14 -

He didn't come there for his money. He came there for the person he was obsessed with, [Ms. Burke].

However, when he arrived at the house, "he encountered a situation he wasn't expecting." The victim thwarted his plan to intimidate his way back into the house, which angered the Appellant. The State summarized that the Appellant,

was mad at [the victim]. And he climbed up seven steps calmly to get to her and to go up there to hurt her and kill her. And nothing was going to stop him.

It was premeditated, because he had the opportunity to think about what he was going to do. He had to get that knife from out of his pocket, because that's where he would have to carry it. He would have to open it. He had to go up seven steps. And in spite of the fact that he knew that she was on the telephone, he killed her. That's how determined he was. That's how intentionally he acted.

After considering the proof and the arguments of counsel, the jury convicted the Appellant of the first degree premeditated murder of the victim. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, claiming that the State failed to prove premeditation or that he possessed the weapon that killed the victim; instead, he asserts that the victim possessed the weapon and that she was killed during a struggle.

## II. Analysis

On appeal, the Appellant contends that the evidence is insufficient to support his conviction of first degree premeditated murder. Initially, the State argues that the Appellant's appeal should be dismissed because his motion for new trial and his notice of appeal were filed untimely and that, in any event, the evidence is sufficient.

The record reflects that the trial court sentenced the Appellant on July 19, 2013, and that the judgment of conviction was entered the same day. Trial counsel did not file the motion for new trial until August 22, 2013, which was untimely. The trial court denied the motion on February 27, 2014. The Appellant's notice of appeal was filed on March 19, 2014.

Because the Appellant's late-filed motion for new trial did not toll the time for filing a notice of appeal, his notice of appeal also was untimely. See Tenn. R. App. P.

4(a) (providing that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from"). Rule 4 states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Id. On appeal, we are limited to addressing whether the evidence is sufficient to support the conviction.

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to obtain the Appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the Appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However, i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). "Premeditation may be proved by circumstantial evidence." State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon the following circumstances to support a jury's inference of premeditation: (1) the Appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the Appellant's declarations of intent to kill; (3) the Appellant's planning activities

before the killing; (4) the manner of the killing, including the Appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the Appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, the proof at trial reveals that the Appellant and Ms. Burke were married for twelve years, the last couple of which were tumultuous. Because of the Appellant's erratic behavior, Ms. Burke filed for and was granted a divorce and an order of protection against the Appellant. Even though the Appellant was aware of the order of protection, he broke into Ms. Burke's house on August 1. Ms. Burke reluctantly allowed him to stay because she cared for him and wanted to help him "get back on his feet." She did not call the police because the police had been ineffectual in dealing with the Appellant in the past. The Appellant refused money sent by Ms. Burke's sister to assist him and remained in Ms. Burke's home. On Sunday, August 7, Ms. Burke told the Appellant that he had to leave. She left him in the Hamilton Creek area around Percy Priest Lake. The Appellant intentionally left the money and his identification in Ms. Burke's vehicle.

Thereafter, Ms. Burke called the victim, who insisted on staying with Ms. Burke that night. The police stopped to check on Ms. Burke and told her that they would patrol the area. The Appellant returned to Ms. Burke's house in a cab; Ms. Burke and the victim were sitting on the porch, drinking beer. The victim told the Appellant to leave and called 911, and Ms. Burke went inside the house. An altercation ensued between the Appellant and the victim, during which the Appellant stabbed the victim three times with a knife. The police later found the pocketknife that the Appellant had used to stab the victim lying on the floor just inside the doorway of the house.

The medical examiner determined that the victim had been stabbed three times, twice in the neck and once in the chest. The fatal wound, which was the four-inch-deep chest wound, was caused when the blade plunged into the victim to "the hilt." We note that "although the particular circumstances of each case will differ, stab wounds have been found to be more consistent with a premeditated killing than other types of wounds because the act of stabbing, by its very nature, requires more effort, time, and intimate contact than does simply pulling the trigger of a gun." State v. Adams, 405 S.W.3d 641, 663 (Tenn. 2013). Officer Ward, who assumed custody of the Appellant immediately after the offense, stated that the Appellant was calm. The police repeatedly stated that the Appellant was "stone cold" calm after the offense. In a recorded interview at the police station shortly after the killing, the Appellant sounded calm. He stated that he went to Ms. Burke's residence and asked for his money and identification and that he became angry when the victim intervened. Although Ms. Burke did not see the Appellant with a

weapon on the night of the offense, she stated that he collected knives and regularly carried one. The case for the pocketknife was found in Ms. Burke's garage, near the boxes in which the Appellant's belongings were stored. Moreover, the Appellant did not have a knife in his possession when he was arrested.

The Appellant challenges the sufficiency of the proof of premeditation, contending that the fact that he asked a corrections officer to drive him to Ms. Burke's residence from the store was "a clear indication that [he] had no intention of doing anything illegal." He also asserts that he could not have planned an attack on the victim prior to his arrival at the residence because he did not know she would be there. He maintains that the State had "to rely on premeditation being formed while [the Appellant sat] at the bottom of the staircase where he waited for Ms. Burke to retrieve his property." The Appellant contends that the victim was intoxicated, constantly berated him, and made him angry. He asserts that neither the neighbor, Ms. Burke, nor the victim saw him with a weapon. He contends that the victim, "who was intoxicated and under the influence of an amphetamine based stimulant, armed herself previous to [the Appellant's] arrival and brandished the blade as the [Appellant] climbed the stairs toward the front door" and that she was hurt during the ensuing struggle. The jury, as was their prerogative, disagreed.

The dissent in this case notes that the Appellant did not engage in any planning activities that indicated an intention to kill the victim. We note that the proof adduced at trial indicates that in the week the Appellant stayed at Ms. Burke's house, he went through boxes of his belongings and retrieved a pocketknife. The Appellant went to Ms. Burke's house that night with the knife. Neither Ms. Burke nor the victim saw the knife prior to the stabbing, suggesting that the weapon was concealed in some manner. Additionally, the blade of the knife had to be forcibly extended; either the Appellant was carrying the knife with the blade exposed and ready for use or he extended the blade immediately prior to stabbing the victim. The Appellant, who habitually carried a knife, did not have a knife in his possession when he was arrested. The dissent also notes that the Appellant and the victim had been friends and that he had no apparent motive to kill her. The record clearly supports that they were long-time friends; the question of motive, however, is less clear. The Appellant went to Ms. Burke's house to retrieve money her sister and brother-in-law sent him in order to get him to leave Ms. Burke alone. As the Appellant stated, "It's my money; she's got it." Accordingly, the Appellant's motive to kill the victim could have been that she stood between him and his money and Ms. Burke, the woman he still thought of as his wife and refused to leave alone. Moreover, the dissent contends that the Appellant's "coldness" during his interview with the police "does not really equate to calmness after the killing." However, as Lieutenant Norrod observed, the Appellant was "[s]tone cold. No emotion at all, especially for someone that he had known for 12 or 13 years that had just been murdered." A reasonable jury could have found it questionable that a person would have no reaction to the murder of someone whom they considered a friend. Additionally, Officer Ward said that the

Appellant was "calm" immediately after the offense. Further, we note that the unarmed victim was stabbed multiple times. The fatal wound was one-half inch long and approximately four inches deep. Dr. Li examined the pocketknife retrieved by the police and noted that the blunt edges on both sides of the stab wound indicated "that someone had stabbed [the victim] and had sunk the knife up to what they call the hilt to where it's blunt on both sides." The knife was inserted "straight forward," meaning that it went "straight in." Additionally, the victim suffered two, albeit not immediately fatal, stab wounds to the neck, as well as a "slash wound" to her neck that was four and one-half inches long and a quarter of an inch deep. Notably, the victim suffered no defensive wounds, which contradicts the Appellant's assertion that the victim attacked him and was wounded in a struggle. Furthermore, the victim called 911 as soon as the Appellant arrived at Ms. Burke's house; the victim informed the Appellant that she was speaking with a 911 operator and told him to leave. Instead of disengaging from the situation, the Appellant instead chose to approach the unarmed victim with a concealed weapon and participate in a violent altercation. We conclude that, based upon the foregoing, a reasonable jury could find that the Appellant acted with premeditation in killing the victim.

The dissent also correctly notes that previous case law provided that a guilty verdict may result from purely circumstantial evidence only if the facts and circumstances of the offense were "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). However, our supreme court rejected the Crawford standard, holding that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of the evidence." Dorantes, 331 S.W.3d at 381. The dissent maintains that "Dorantes is not an invitation for a reviewing court to accede to a fact-finder's determination of direct or circumstantial evidence, however slight or speculative the basis for the determination may be." The dissent contends that although Dorantes "effects a difference in the way juries are instructed, but [it is unclear] that it affects the basic function of judicial review."

In State v. Sisk, 343 S.W.3d 60, 65-66 (Tenn. 2011) (citations omitted), our supreme court clarified the change from the Crawford standard of review to the Dorantes standard of review:

> Years ago, in [Crawford], this Court adopted a standard of proof in criminal prosecutions based exclusively upon circumstantial evidence that purportedly required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." This Court also stated in Crawford that in such cases, "[a] web of

guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." This language was recited for years by Tennessee courts as controlling in those cases in which the sufficiency of exclusively circumstantial evidence was at issue . . . . In State v. James, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010), however, we pointed out the inconsistency between the terminology employed in Crawford and its progeny and the standard of proof applied by the United States Supreme Court in those cases in which the evidence is solely circumstantial. Finally, in [Dorantes], we adopted the federal standard in Tennessee and eschewed any distinction between the standard of proof required in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. Although we observed in Dorantes that, as a practical matter, there was little difference between the federal standard and the "reasonable hypothesis" language used in Crawford, we also noted that, depending on the nature of the circumstantial evidence presented at trial, the adoption of the federal standard of proof could result in a different outcome in some cases.

Thus, it appears clear that our supreme court envisioned cases, and in fact Dorantes and Sisk are examples of such, when departing from the Crawford standard could result in a different outcome. Nevertheless, as noted by the dissent, Dorantes did not completely insulate a jury's verdict from appellate review. Instead, Dorantes kept faith with the ever-present requirement that "in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 379. Further, Dorantes held firm that on appeal, an appellate "court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases." Id. Respectfully, we submit that the dissent has substituted its own inferences instead of those drawn by the trier of fact in the instant case. While the dissent's view of events, in which the Appellant acted only knowingly and without premeditation, may be plausible, it is not the only option. The jury, instead, determined that the Appellant behaved coolly and dispassionately in attacking the unarmed victim, stabbing deep into her chest and puncturing her lung and heart, and repeatedly stabbing and slicing her throat without giving her the opportunity to fight back. The jury heard the testimony adduced at trial and the recordings of the 911 call and the interview with the Appellant. Again, we conclude that from the proof at trial, a

reasonable jury could find that the Appellant acted with premeditation in killing the victim.

### III.  Conclusion

Finding no error, we affirm the judgment of the trial court.


_____
NORMA MCGEE OGLE, JUDGE